**Ruben Rios SALINAS, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2000–SC–0126–MR.

Supreme Court of Kentucky.

June 13, 2002.

Rehearing Denied Oct. 17, 2002.

914

Thomas M. Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

A.B. Chandler, III, Attorney General, Frankfort, KY, Ian G. Sonego, William L. Daniel, II, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, for appellee.

COOPER, Justice.

Appellant Ruben Rios Salinas was convicted by a Fayette Circuit Court jury of murdering Aubrey L. ("Al") Nuckolls, for which he was sentenced to life in prison, and for kidnapping Nuckolls, for which he was sentenced to life in prison without benefit of probation or parole. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). We reverse and remand for a new trial because of (1) the improper introduction of hearsay evidence and (2) an improper instruction on the aggravating circumstance necessary for imposition of capital punishment.

At about 3:00 p.m. on Thursday, September 10, 1998, Nuckolls told his wife, Gayle, that he was going to a pharmacy to refill his prescription medication. He drove away in his red 1988 Pontiac automobile and did not return. The next morning, Gayle Nuckolls found a note inside the front storm door of her home stating that her husband was "fine" and directing her to dial his pager number. She did so, and, when the call was returned, an unknown voice advised her that her husband had been in a "drug deal gone wrong," that he was in serious trouble, and that she needed to get a lot of money together in order to save him. Mrs. Nuckolls advised the caller to "throw him off a cliff" and reported her husband's disappearance and the telephone call to the police. Mrs. Nuckolls explained that her unusual response to the caller was because her husband had previously been engaged in narcotics trafficking but had assured her that he was no longer involved in

criminal activities. In fact, at the time of his disappearance, Nuckolls was under investigation for possible narcotics trafficking, gun smuggling, and counterfeiting. After his disappearance, police investigators found $10,000.00 worth of marijuana in a rental storage facility controlled by Nuckolls and his wife.

Nuckolls's girlfriend, Nancy Burd, testified that Nuckolls called her home "800" number on September 10, 1998, to tell her that he was taking a trip to Ohio. At about 5:00 a.m. on Friday, September 11, 1998, Burd received a telephone call from an unknown person advising her that Nuckolls had been in a "drug deal gone bad," that he was in danger, and that she needed to send him $20,000.00. Burd assumed the caller was talking about money for a bail bond. Three hours later, she received another telephone call from the same unknown person asking if she intended to "help Al." She responded, "No, I am going to work," which she did. Early Sunday morning, September 13, 1998, Burd received another telephone call from the same unknown person advising her that Nuckolls had been kidnapped and was being held for $20,000.00 ransom.

On September 13, 1998, Appellant telephoned Anne Gautier, an "acquaintance," and asked her if he could park an automobile on the rural Jessamine County property where Gautier resided with her husband, Guy Gautier, and their two children. Gautier agreed, and Appellant brought a vehicle to her property later that day. The vehicle was later identified as the red 1988 Pontiac belonging to Al Nuckolls.

On Monday, September 14, 1998, Gayle Nuckolls received a letter, postmarked September 11, 1998, threatening not only her husband, but also herself and her father, if she did not respond positively to the previous demand for money. She gave the letter to the police. Approximately one month later, Al Nuckolls's dead body was found in the trunk of the red 1988 Pontiac still parked on the Gautier property. His legs and arms were bound together with baling wire, and his body was wrapped in cardboard and tarpaulin and covered with lime. He had been shot twice, once in the back of the head and once in the right temple.

Appellant, a person of Mexican heritage, testified that he was engaged in the business of importing merchandise from Mexico to Lexington, Kentucky, for resale. His family lived in Texas, and, when in Lexington, he lived in a house that he shared with Chris Kaluski. Appellant admitted that he was acquainted with Nuckolls and that the two had often discussed possible business transactions but had actually participated in only one small, joint transaction. Appellant testified that, on September 10, 1998, Nuckolls came to his residence demanding money. Appellant admitted killing Nuckolls but claimed he did so in self-defense. He also admitted that he, with the assistance of Kaluski's employee, Gary Wade, loaded Nuckolls's body into the trunk of the Pontiac, and that he then drove the vehicle to the Gautier property and parked it. Finally, he admitted that he placed the note in the front door of the Nuckolls residence, wrote the threatening letter received by Gayle Nuckolls on September 14, 1998, and made the telephone calls described by Gayle Nuckolls and Nancy Burd. He claimed the kidnap/ransom story was a hoax designed to steer suspicion away from himself.

After his arrest, Appellant wrote a letter to Anne Gautier advising her that the police were in possession of a "flow chart" identifying both her and her husband as members of the "Bluegrass Conspiracy" organization headed by Al Nuckolls. The letter also indicated that the Gautiers were acquainted with Chris Kaluski and sug-

gested that "[y]ou will probably feel like taking a long vacation, depending on the calendar." Appellant wrote another letter to Kaluski informing him that the Gautiers were on the "Bluegrass Conspiracy" flow chart and that "Gary needs to go away about a month before and stay away."

## I. SUFFICIENCY OF THE INDICTMENT.

■ Appellant asserts that the indictment was insufficient to establish subject matter jurisdiction because the charges did not describe every element of each offense, *i.e.*, whether the murder was committed intentionally or wantonly and whether the kidnapping was committed for ransom or reward, as opposed to another of the four purposes enumerated in KRS 509.040(1). As pointed out in *Thomas v. Commonwealth*, Ky., 931 S.W.2d 446, 448–50 (1996), an indictment is not insufficient because of its failure to detail the formerly "essential" factual elements of the offense so long as it informs the accused of the specific offense with which he is charged and does not mislead him. Count One charged Appellant with murder, capital offense, for killing Aubrey Nuckolls in violation of KRS 507.020; Count Two charged him with kidnapping, capital offense, for kidnapping Aubrey Nuckolls in violation of KRS 509.040. Per *Thomas, supra,* that was sufficient to inform Appellant of the specific offenses with which he was charged. *See also Harris v. Commonwealth*, Ky., 793 S.W.2d 802, 804 (1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991).

## II. DEATH–QUALIFICATION OF THE JURY.

■ Appellant asserts that (1) he was not eligible for the death penalty because there was no aggravating circumstance, KRS 532.025(3); (2) imposition of the death penalty for kidnapping violates the Eighth Amendment proscription against cruel and unusual punishment; and (3) he was prejudiced by the death-qualification of the jurors in his case because death-qualified jurors are more prone to convict. None of these objections were raised at trial; thus, none are preserved for appellate review. Nevertheless, we have held that the murder of the kidnapping victim is an aggravating circumstance authorizing imposition of the death penalty for the offense of kidnapping. *St. Clair v. Roark,* Ky., 10 S.W.3d 482, 486–87 (1999); *Harris v. Commonwealth, supra* at 805. Contrary to Appellant's assertion, the United States Supreme Court has not held otherwise. His reliance on *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) and *Eberheart v. Georgia,* 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977) (memorandum opinion), is misplaced. In neither of those cases was the victim of the rape or kidnapping also murdered. And it is now well established that death-qualification of prospective jurors does not violate a defendant's constitutional right to a fair and impartial jury. *Buchanan v. Kentucky,* 483 U.S. 402, 414–15, 107 S.Ct. 2906, 2913–14, 97 L.Ed.2d 336 (1987); *Lockhart v. McCree,* 476 U.S. 162, 177, 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137 (1986). That is especially true where, as here, Appellant's offenses qualified him for the death penalty. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

## III. ADMONITION UPON SEPARATION.

■ RCr 9.70 provides:

The jurors, whether permitted to separate or kept in charge of officers, must be admonished by the court that it is their duty not to permit anyone to speak to, or communicate with, them on any subject connected with the trial, and that all attempts to do so should be

immediately reported by them to the court, and that they should not converse among themselves on any subject connected with the trial, nor form, nor express any opinion thereon, until the cause be finally submitted to them. This admonition must be given or referred to by the court at each adjournment.

Appellant complains that, on several occasions during voir dire, the trial court either failed to admonish the jury as required by RCr 9.70 or gave an incomplete admonition. Again, defense counsel did not object to any of these perceived failures; thus, the issue is not preserved for appellate review. *Spencer v. Commonwealth*, Ky., 467 S.W.2d 128, 130–131 (1971). Furthermore, Appellant does not identify any instance where any member of the jury conducted him/herself contrary to the mandate of the admonition. *Commonwealth v. Messex*, Ky., 736 S.W.2d 341 (1987); *Schweinefuss v. Commonwealth*, Ky., 395 S.W.2d 370 (1965). Thus, if any error occurred, it was harmless beyond a reasonable doubt.

## IV. KIDNAPPING: SUFFICIENCY OF THE EVIDENCE.

Appellant asserts there was insufficient evidence that Nuckolls was restrained prior to his death to convict him of kidnapping. That would be true if the jury were required to believe Appellant's version of the events, *i.e.*, that he first killed Nuckolls, then bound his arms and legs with baling wire and wrapped his body in cardboard and tarpaulin. However, kidnapping can be proven by circumstantial evidence. In *Meredith v. Commonwealth*, Ky., 959 S.W.2d 87, 90 (1997), the victim's body was found alongside a highway rolled up in a carpet with coaxial cable wrapped around her neck and right wrist, and with duct tape wound loosely around her neck that arguably was a gag that had slipped to her neck during decomposition. Such evidence was held sufficient to support a conviction of kidnapping despite other uncontradicted evidence that the victim was last seen voluntarily entering the defendant's truck. Here, the jury could reasonably believe that Nuckolls was restrained by being bound with baling wire and/or wrapped in cardboard and tarpaulin before he was killed, that Appellant's demands for ransom were not a hoax, and that Appellant did not kill Nuckolls until it became apparent that no ransom would be forthcoming. The evidence was sufficient to support the conviction of kidnapping. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186 (1991).

Appellant's argument that his kidnapping conviction was precluded by the exemption statute, KRS 509.050, is equally meritless. That statute precludes conviction of kidnapping if (1) the accused's criminal purpose was the commission of an offense other than kidnapping, i.e., murder; (2) the restraint relied upon as an element of the kidnapping occurred immediately with and incidental to the commission of the primary offense; and (3) the restraint did not exceed that ordinarily incident to the commission of the primary offense. *Griffin v. Commonwealth*, Ky., 576 S.W.2d 514, 516 (1978). Appellant's version was that the restraint occurred after Nuckolls was killed, in which event there could be no kidnapping. However, as explained above, a jury could reasonably believe that Appellant's primary purpose was to kidnap Nuckolls for ransom or reward and that he killed Nuckolls only after the ransom scheme failed.

## V. HEARSAY.

Detective Shane Ensminger was not involved in the investigation of the murder of Nuckolls. He was, however,

investigating Nuckolls's alleged involvement in narcotics, gun smuggling, and counterfeiting in Kentucky, Ohio and West Virginia. Ensminger had recruited a confidential informant who claimed to have been involved in Nuckolls's counterfeiting activities and who was awaiting sentencing in West Virginia on a counterfeiting conviction. Ensminger testified that he asked the informant if he had any information that might be helpful in solving the murder case and that the informant sent him a handwritten "flow chart" purporting to identify members of an organization known as "Old Bluegrass Conspiracy (BGC)."[1] The informant did not testify at trial, and Ensminger admitted he had no personal knowledge as to the accuracy of the chart. Nevertheless, over Appellant's objection, the chart was introduced into evidence as Commonwealth's Exhibit 59. Ensminger then proceeded to describe the contents of the chart in detail.

The chart shows two lines flowing from "Old Bluegrass Conspiracy (BGC)." The first line leads to Mike and Bonnie Kelly and members of their family. The Kellys were identified by Ensminger as murderers of a Florida prosecutor. The second, broken line, accompanied by a question mark (?), leads to A.L. Nuckolls. Other lines lead from both Mike Kelly and Nuckolls to Anne and Guy Gautier. The chart identifies Anne Gautier as Mike Kelly's cousin and Guy Gautier as an "associate of A. L." and a cocaine distributor for "BGC." Other lines lead from Nuckolls to the Kellys and to sundry other persons, including a "gun dealer in Middleport, Ohio," and "New York and New Jersey Italian Families." Each line identifies the criminal activity engaged in by the person to whom the line leads. A line labeled "dope and checks" runs from Nuckolls to a person identified only as "Mexican hitter." Another line connects "Mexican hitter" with the "New York and New Jersey Italian Families" and with "Charles Albano." Ensminger did not know the true identity of "Mexican hitter." Of course, Appellant was the only person of Mexican heritage charged with murder in this case.

Exhibit 59 and Ensminger's repetition of its contents, including the very existence of an alleged organization known as the "Old Bluegrass Conspiracy," were pure hearsay, *i.e.*, out-of-court statements offered to prove the truth of the matter asserted. KRE 801(c); KRS 802; *cf. Gosser v. Commonwealth*, Ky., 31 S.W.3d 897, 900–03 (2000) (diagrams prepared out-of-court by absent witnesses or based on information furnished by absent witnesses were inadmissible hearsay). In *Gosser*, the error was cured when the witnesses who furnished the information subsequently testified and verified the accuracy of the diagrams. Here, the error was not cured.

The prejudicial effect of Exhibit 59 is obvious. Although the "flow chart" did not specifically identify Appellant as the "Mexican hitter" with presumably mafia connections, it did connect the "Mexican hitter" to Nuckolls, whom Appellant admittedly killed, connected Nuckolls to the Gautiers, on whose property Appellant hid Nuckolls's body, and connected both Nuckolls and the Gautiers to other alleged murderers, Mike and Bonnie Kelly. The obvious implication was that Appellant, a person of Mexican heritage, was the "Mex-

---

1. "Bluegrass Conspiracy" was the name given to a narcotics and smuggling organization with Lexington, Kentucky, connections in a locally sensational book of the same name. Sally Denton, *The Bluegrass Conspiracy* (Doubleday 1990). The book purports to be non- fiction. It also contains an index of every person, place and business mentioned in the text of the book. The index does *not* include the names of Appellant, Nuckolls, the Gautiers, Kaluski, or Wade.

ican hitter" and was involved with Nuckolls and the Gautiers in a major criminal operation. From that, it would take only a small leap of inference for the jury to conclude that Appellant was a professional killer who had not killed a casual acquaintance in self-defense, but who had kidnapped and "hit" (murdered) a criminal associate for the purpose of monetary reward. (There was also evidence that Appellant went to the rental storage shed after Nuckolls's disappearance but was unable to open the shed with Nuckolls's key because the shed had both a key lock and a combination lock.)

■ The Commonwealth does not claim on appeal that Exhibit 59 was not hearsay. It asserts that the document was relevant because of references to it in the letters Appellant wrote to Anne Gautier and Chris Kaluski. Of course, inadmissible hearsay does not become admissible simply because it is relevant. Most incompetent evidence is offered precisely because it is highly relevant. To be admissible, however, evidence must be both relevant and competent. *Moseley v. Commonwealth*, Ky., 960 S.W.2d 460, 461 (1997).

Next, the Commonwealth asserts that Appellant's objection is unpreserved. The log of the videotaped trial proceedings reflects that Exhibit 59 was admitted into evidence at 8:51:44 on December 14, 1999. A review of the videotape indicates that, at that time, Ensminger had identified the flow chart as the document he received from his confidential informant but had not yet described its contents. The prosecutor is seen handing the exhibit to the court clerk who then appears to write something on the exhibit. Defense counsel immediately objected and the trial judge responded, "O.K." A proper and timely objection was made to the admission of Exhibit 59, and we must conclude that, by "O.K.," the trial judge meant to overrule the objection

since the exhibit was, in fact, admitted into evidence.

■ Finally, the Commonwealth argues that defense counsel's subsequent cross-examination of Ensminger concerning the contents of Exhibit 59 constituted a waiver of his previous objection. If that were true, any party against whom evidence was improperly admitted would be required to forego cross-examination and enhance the risk of losing at trial, or attempt to cross-examine in an effort to mitigate the prejudicial effect of the evidence and thereby be deemed to have acquiesced in the error. We find that proposition untenable, and we specifically disapprove any *dictum* to the contrary in *Frank v. Commonwealth*, Ky., 907 S.W.2d 771 (1995). *Frank* cited *Asher v. Commonwealth*, Ky., 275 S.W.2d 416 (1955) for the proposition that "[a] defendant's objection to evidence is waived by subsequent cross-examination of a prosecution witness in respect to the same matter." *Frank*, at 773. In *Asher*, however, the defendant subsequently *presented* the same evidence to which he had previously objected during cross-examination of *other* witnesses who had not previously testified to that same evidence. *Asher*, at 418–19.

## VI. INSTRUCTION ON AGGRAVATING CIRCUMSTANCE.

■ Appellant was convicted of intentional murder and kidnapping. There was no aggravating circumstance that would authorize capital punishment for the murder conviction. *Jacobs v. Commonwealth*, Ky., 58 S.W.3d 435, 450 (2001). However, the murder of the victim of a kidnapping is an aggravating circumstance authorizing capital punishment for the kidnapping conviction. *St. Clair v. Roark, supra*, at 486–87; *Harris v. Commonwealth, supra*, at 805. Here, the guilt phase instruction on capital kidnapping properly required the jury to find as an element of that offense

that the victim was not released alive. KRS 509.040(2). That is the element that enhances kidnapping from a Class B felony to a capital offense. However, the penalty phase instruction identified that same fact as the aggravating circumstance authorizing capital punishment:

### INSTRUCTION NO. 17

### COUNT 2

### AGGRAVATING CIRCUMSTANCE

In fixing a punishment for the Defendant for the Kidnapping of Aubrey Nuckolls, you shall consider the following aggravating circumstance if, and only if, you believe from the evidence beyond a reasonable doubt:

The Defendant committed the offense of Kidnapping and Aubrey Nuckolls was not released alive.

In reaching its verdict as to the penalty, the jury made the following finding:

We the jury, by unanimous vote, find that the aggravating circumstance described in Instruction No. 17, "The Defendant committed the offense of kidnapping and Aubrey Nuckolls was not released alive" has been proven from the evidence beyond a reasonable doubt.

/s/

FOREMAN

As stated above, the fact "that the victim was not released alive" is the element that enhances kidnapping from a Class B felony to a capital offense. However, that fact is not an aggravating circumstance necessary to authorize imposition of capital punishment under KRS 532.025(2). Although there was sufficient evidence for the jury to find the aggravating circumstance of murder committed during the course of the kidnapping, the instruction did not require that finding, and the verdict did not include that finding. If the evidence is the same on retrial, the jury shall be instructed to the effect that capital punishment cannot be imposed absent a finding that Appellant murdered Nuckolls during the course of the kidnapping. *See generally* Cooper, 1 *Kentucky Instructions to Juries (Criminal)* §§ 12.07 and 12.10A.

Accordingly, the judgments of conviction and sentences imposed in this case are reversed and this case is remanded to the Fayette Circuit Court for a new trial in accordance with this Opinion.

LAMBERT, C.J.; GRAVES, JOHNSTONE and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents without separate opinion.

KELLER, J., not sitting.