**Michael D. ST. CLAIR, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2001–SC–0209–MR.

Supreme Court of Kentucky.

Oct. 20, 2005.

As Corrected Oct. 24, 2005.

Donna L. Boyce, Judy Namkin, Assistant Public Advocates, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, David A. Smith, Tami Allen Stetler, Brian T. Judy, Assistant Attorneys General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Chief Justice LAMBERT.

### FACTS

Appellant, Michael D. St. Clair, was convicted of two counts of receiving stolen property over $100, criminal attempt to commit murder, second-degree arson, and capital kidnapping. He was sentenced to death for the kidnapping of Frank Brady, during which Brady was murdered. Appellant waived his right to jury sentencing on the non-capital charges, and agreed to a sentence of twenty years for attempted murder, twenty years for second-degree arson, and five years on each count of receiving stolen property over $100, for a total of fifty years. Appellant now appeals to this Court as a matter of right.[1]

This is not the first time this particular defendant is before this Court. In February of 1992, a Bullitt County Grand Jury indicted Appellant for the Capital Murder of Frank Brady. He was tried and convicted in August, and sentenced to death in September of 1998. This Court in a recent decision, *St. Clair v. Commonwealth*,[2] (hereinafter "St. Clair I"), reversed and remanded for a new penalty phase hearing on Appellant's death sentence. Prior to trial in Hardin County, this Court rendered *St. Clair v. Roark*,[3] (St. Clair II), in which St. Clair's petition for extraordinary relief to prevent his prosecution for capital kidnapping in Hardin County was denied. In large part a complete recitation of the facts is contained in St. Clair I and St. Clair II, and is relied upon to illustrate the facts relevant to this appeal.

---

1. Ky. Const. § 110(2)(b).

2. 140 S.W.3d 510 (Ky.2004).

3. 10 S.W.3d 482 (Ky.2000).

According to the evidence, Appellant escaped from Oklahoma authorities in September of 1991 while awaiting final sentencing for two Oklahoma murder convictions. St. Clair and Dennis Gene Reese stole a pickup truck from a jail employee and fled from the jail in Durant, Oklahoma. The pickup truck eventually ran out of gas and Reese and St. Clair stole another pickup truck, a handgun, and some ammunition from the home of Vernon Stephens and headed for the suburbs of Dallas, Texas. St. Clair's wife at the time, Bylynn St. Clair[4] ("Bylynn"), met with her husband and Reese in Texas, and provided them with money, clothing, and other items. Reese was arrested several months later in Las Vegas, Nevada, and confessed to his involvement in the Kentucky events detailed below.

According to Reese, after escaping from jail in Oklahoma, he and St. Clair traveled to Colorado where they kidnapped Timothy Keeling and stole Keeling's pickup truck. Keeling was later murdered in New Mexico. St. Clair and Reese proceeded to drive Keeling's truck to New Orleans, Louisiana, then through Arkansas and Tennessee before arriving at a rest stop in southern Hardin County, Kentucky. While in Hardin County, they decided to steal Frank Brady's late model pickup truck. They kidnapped Brady and drove him from Hardin County to Bullitt County where St. Clair shot and killed Brady. St. Clair and Reese then returned to Hardin County and set fire to Keeling's truck.

Witnesses to the arson gave the Kentucky State Police a description of the Brady truck seen near the location where Keeling's truck was on fire. Based on that description, Trooper Herbert Bennett stopped Reese and St. Clair while they were still driving Brady's truck through Hardin County. St. Clair fired two shots at Trooper Bennett, one of which penetrated the radiator of the police cruiser. A high-speed chase followed, but Reese and St. Clair escaped when Bennett's cruiser became disabled. Reese was arrested two weeks later in Las Vegas and waived extradition to Kentucky. St. Clair was arrested about two months later in Hugo, Oklahoma.

On December 20, 1991, St. Clair was indicted for two counts of receiving stolen property, criminal attempt to commit murder, and second-degree arson. On January 17, 1992, the Hardin County Grand Jury indicted St. Clair for capital kidnapping. On June 19, 1998, the Commonwealth filed its Notice of Intent to Seek Death Penalty. St. Clair was convicted in February of 2001 of the Capital Kidnapping of Frank Brady, and he was sentenced to death. Additional facts will be presented as necessary. St. Clair argues that his wife Bylynn was improperly allowed to testify to four privileged conversations, and that those conversations should have been excluded by his assertion of the marital privilege under KRE 504. When the statements were made, St. Clair and Bylynn were married.

### I. Marital Privilege

The first contested statement given by Bylynn was that when she met St. Clair in Texas before St. Clair reached Kentucky, she hugged him and felt something hard on his belt. Over St. Clair's objection, she testified that when she asked if he had a gun, she testified that he, St. Clair, told her he took a gun off that old man whose house he had broken into (the home of Vernon Stephens in Oklahoma).

Bylynn's second statement concerned her meeting St. Clair in Oklahoma at

4. She has since remarried and changed her name to Van Zandt.

Frost's Farm in December of 1991, the night before he was arrested. It was there that St. Clair stated to Bylynn that St. Clair and Reese had to leave their belongings and that they burned a truck. St. Clair told Bylynn that he returned to Oklahoma by riding with truck drivers. St. Clair objected and moved for a mistrial on the grounds that this latter statement had not been included in the Commonwealth's notice, and that it was privileged under the marital privilege.

Bylynn's third statement at trial concerned a telephone conversation between her and St. Clair. She testified that St. Clair called her from Louisiana and that Reese was in the bathroom while he was calling. The Commonwealth then elicited that St. Clair told Bylynn that he had to leave some of his things behind in the truck, and that he said something about being in Louisiana. St. Clair objected on the grounds that he was not provided notice of the Commonwealth's intention to introduce evidence relating to his travel to Louisiana, and that it was not an unexpected answer since the Commonwealth asked her if St. Clair had ever said anything about being in Louisiana. The Commonwealth responded that this testimony was not new information since Bylynn had testified to it at the Bullitt County trial.

Bylynn's fourth statement is that St. Clair told her that he was in Louisiana, and that he had told her he had been in Oklahoma for a few weeks before he saw her in December at a friend's house in Durant County, Oklahoma. She stated that he had told her that the Oklahoma State Bureau of Investigation (OSBI) had searched the place, but that he was hiding under some hay and they never saw him. The Commonwealth then asked Bylynn

how long St. Clair had told her he had been in Oklahoma and the date of the conversation when he did so. She responded that it was December 17, 1991, the day before his arrest. This testimony was elicited to contradict Reese's anticipated testimony that St. Clair had arrived at his farm on October 1, 1991.

St. Clair objected to the testimony, and the trial court overruled the objection on the grounds that the Commonwealth could cross-examine Bylynn about any subject to which she had previously testified. St. Clair now argues that the introduction of this testimony violated due process, his right to a fair trial and that Bylynn's testimony was admitted in violation of the marital privilege. St. Clair also argues that at the time of trial, KRS 421.210(1) was applicable and allowed one spouse to prohibit the other from testifying to communications made during their marriage, which are confidential in nature.[5] Finally, St. Clair argues that Bylynn's statements that incriminated St. Clair were also inadmissible since they violated RCr 7.24(1).

The Commonwealth contends that the marital privilege does not apply in this case for two reasons. First, the Commonwealth argues that Bylynn and St. Clair were involved in joint criminal activity under KRE 504(c)(1). It posits that no privilege is applicable since the communications testified to occurred during St. Clair's escape from the Bryan County Jail in Oklahoma and that Bylynn provided him with items which he later used to kidnap and kill Brady. Second, the Commonwealth argues that these communications were not confidential because they were made in the presence of Reese.

5. KRS 421.210(1) was repealed by Acts 1992, ch. 324, Sec. 30 effective July 1, 1992. For present law see KRE 501 to 511.

■ KRE 504 contains a spousal testimonial privilege, KRE 504(a), a confidential marital communications privilege, KRE 504(b), and exceptions to those privileges in KRE 504(c). Both privileges are designed to protect and enhance the marital relationship at the expense of otherwise useful evidence.[6] KRE 504(c)(1) codifies preexisting law, KRS 421.210(1).[7] KRE 504 provides:

(a) Spousal testimony. The spouse of a party has a privilege to refuse to testify against the party as to events occurring after the date of their marriage. A party has a privilege to prevent his or her spouse from testifying against the party as to events occurring after the date of their marriage.

(b) Marital communications. An individual has a privilege to refuse to testify and to prevent another from testifying to any confidential communication made by the individual to his or her spouse during their marriage. The privilege may be asserted only by the individual holding the privilege or by the holder's guardian, conservator, or personal representative. A communication is confidential if it is made privately by an individual to his or her spouse and is not intended for disclosure to any other person.

(c) Exceptions. There is no privilege under this rule:

(1) In any criminal proceeding in which sufficient evidence is introduced to support a finding that the spouses conspired or acted jointly in the commission of the crime charged;

(2) In any proceeding in which one (1) spouse is charged with wrongful conduct against the person or property of:

(A) The other;

(B) A minor child of either;

(C) An individual residing in the household of either; or

(D) A third person if the wrongful conduct is committed in the course of wrongful conduct against any of the individuals previously named in this sentence. The court may refuse to allow the privilege in any other proceeding if the interests of a minor child of either spouse may be adversely affected; or

(3) In any proceeding in which the spouses are adverse parties.

KRE 504(a) and (b) changed the spousal privilege from KRS 421.210(1) in two significant respects.[8] First, the testimonial privilege in KRE 504(a) was expanded to enable a party spouse to preclude a witness spouse from testifying against him.[9] Second, the marital communications privilege in KRE 504(b) was narrowed by defining the term "confidential" to require that the communication was not intended for disclosure to any other person, i.e., there must have been a positive expectation of confidentiality.[10]

■ The issue we must first address is whether subsection (c)(1) applies in this situation. We begin our analysis by examining the plain language of KRE 504(c)(1). The plain language of the exception states that there must be "sufficient evidence" to "support a finding that the spouse con-

---

**6.** *Gill v. Commonwealth*, 374 S.W.2d 848 (Ky. 1964).

**7.** Lawson, *The Kentucky Evidence Law Handbook*, § 5.10[6], at 374(4th ed. Lexis Nexis 2003).

**8.** *See generally Slaven v. Commonwealth*, Ky., 962 S.W.2d 845, 851–56 (1998).

**9.** *Id.* at 851.

**10.** *Id.*

spired or acted jointly in the commission of the *crime charged*."[11] Plainly, this exception to the privilege applies only if each spouse has contributed to or participated in the crime charged. In *Gill v. Commonwealth*,[12] this Court discussed the application of the marital communications privilege and its exceptions as they existed under KRS 421.210(1). In *Gill*, testimony of one spouse was held not privileged where both spouses were accused of being *particeps criminis* with the wife having been indicted for the same crime that her husband had been convicted of committing.[13]

In this case, Bylynn facilitated St. Clair's flight after his prison escape, but there was no evidence that Bylynn conspired or acted jointly in the commission of the crimes with which St. Clair was charged (two counts of receiving stolen property over $100, criminal attempt to commit murder, second-degree arson, or capital kidnapping).

■ This Court has reviewed the record extensively. Statements two and three[14] were undoubtedly made outside the presence of Reese or any other person. Bylynn acknowledged on the stand that statement two occurred in private when she and St. Clair were in a barn loft. She also confirmed that statement three occurred during a phone conversation with St. Clair while Reese was out of the room. As stated in KRE 504(b), "[a] communication is confidential if it is made privately by an individual to his or her spouse and is not intended for disclosure to any other person." St. Clair was running from the authorities, and confided certain information to his wife. His statements implicated him in various crimes, and their sensitive nature combined with the circumstances of their disclosure rendered them confidential. For these reasons statements two and three fall within the ambit of a confidential communication, and should have been excluded by virtue of the marital privilege.

■ Upon review, there is some doubt as to the confidential nature of statements one and four.[15] Statement one took place at a fair, and apparently was made in full view of the public eye. Moreover, based on the testimony of Bylynn, it is unclear whether St. Clair was alone or with Reese at the time of this statement. However, confidential statements need not be given behind closed doors to retain their confidential character. A hushed or whispered statement from one spouse to another may be considered confidential depending on the circumstances of its disclosure. In this case, the record is insufficient to make a definitive determination as to the confidential nature of statement one. Therefore, upon remand the trial judge should hear additional evidence regarding the circumstances of statement one and make a factual finding.

Whether statement four was confidential is equally unclear. At trial, Bylynn seemed to relate the statement four disclosure to the same telephone conversation in which the statement three disclosure was made. If this is the case, statement four would enjoy the same privileged status as statement three. However, review of the record leaves the Court with enough doubt to require a hearing on the statement four issue.

11. KRE 504(c)(1) (emphasis added).

12. 374 S.W.2d 848.

13. *Id.* at 851.

14. *See supra* p. 477.

15. *See supra* pp. 477–478.

Accordingly, statements two and three were privileged and should have been excluded at trial. As to statements one and four, a hearing should be held on remand to determine their status.

■ The admission of the privileged statements was prejudicial because the Commonwealth used this testimony to corroborate Reese's testimony that St. Clair was the ringleader and the shooter. Bylynn was a critical witness as her testimony repeated the details of the jail escape and that St. Clair had stolen the alleged murder weapon. It revealed that she felt a gun on Appellant's person when she met him in Dallas, and her testimony contradicted St. Clair's defense that he had never been in Kentucky because he told her he had burned a truck in Kentucky. Bylynn's testimony was crucial because it contained the only admission by St. Clair of guilt, and one of a few pieces of evidence that placed St. Clair in Kentucky at the time of the kidnapping and murder. Consequently, the admission of Bylynn's testimony was prejudicial error and retrial is required.

## II. Jury Instructions

In anticipation of retrial, we deem it necessary to provide guidance on the penalty phase instructions given as the language with respect to some of the aggravators was either misstated or erroneous. St. Clair argues that he was denied his right to a fair trial by the penalty phase instructions given to the jury. Specifically, St. Clair contends that it was improper for the jury to be allowed to recommend a death sentence if it found that the kidnapping victim was not released alive; if it found that he had a prior record of convic-

tion for murder; or if it found that he committed a robbery. During the penalty phase, the jury found all three aggravators.

The following instructions on aggravating circumstances were given during the penalty phase of trial:

### INSTRUCTION NO. 3

#### (Aggravating Circumstances)

In fixing a sentence for Michael Dale St. Clair for the offense of Kidnapping, you shall consider the following aggravating circumstances which you believe from the evidence beyond a reasonable doubt to be true:

1. The Kidnapping victim was not released alive.

2. The Defendant has a prior record of conviction for Murder, a capital offense.

3. The offense of Kidnapping was committed while the Defendant was engaged in the commission of Robbery in the first Degree, as defined in Instruction No. 4.

Appellant contends that these aggravators are improper. KRS 532.025(2) provides:

> In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instruction to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence.

KRS 532.025(2)(a) sets forth a list of eight aggravating circumstances [16] to be consid-

---

16. KRS 532.025(2)(a) lists aggravating circumstances as follows:

  a) Aggravating circumstances:

    1. The offense of murder or kidnapping was committed by a person with a prior record of conviction for a capital offense, or the offense of murder was committed by a

ered by the jury for eligibility to establish the sentences of death, imprisonment of life without benefit of probation or parole, or imprisonment for life without probation or parole for 25 years (LWOP 25) if those circumstances are supported by the evidence[17] of the case, and are found by a jury to exist beyond a reasonable doubt.[18]

An inherent conflict exists within KRS 532.025 between the provisions requiring a trial judge to instruct on "any mitigating or aggravating circumstances *otherwise authorized by law*",[19] and KRS 532.025(3) that prohibits the imposition of sentences of death, life, or LWOP 25 unless the jury finds that one of the *enumerated* statutory aggravating circumstances exists.[20]

The statutory conflict was reconciled in a group of decisions from this Court. In *Harris v. Commonwealth*,[21] we held that the murder of a kidnapping victim is an aggravator "otherwise authorized by law" in KRS 509.040(2) specifically allowing a jury to impose a sentence of death, life, or LWOP 25 for kidnapping.[22] In a note in *Young v. Commonwealth*,[23] we said that capital punishment could be imposed where a defendant murdered the victim during the kidnapping. *Young* clarified that "[k]idnapping is a capital offense and *Harris* holds that murder, though not an aggravating circumstance enumerated in KRS 532.025(2)(a), is an 'aggravating circumstance otherwise authorized by law.'"[24] The note culminates in an explanation of the interplay between KRS 532.025(2) and the crime of kidnapping by stating as follows:

> Murder, of course, is proscribed by KRS 507.020. While kidnapping is enhanced to a capital offense if the victim is not released alive or subsequently dies as a result of the kidnapping, the additional

person who has a substantial history of serious assaultive criminal convictions;

2. The offense of murder or kidnapping was committed while the offender was engaged in the commission of arson in the first degree, robbery in the first degree, burglary in the first degree, rape in the first degree, or sodomy in the first degree;

3. The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one (1) person in a public place by means of a weapon of mass destruction, weapon, or other device which would normally be hazardous to the lives of more than one (1) person;

4. The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit;

5. The offense of murder was committed by a person who was a prisoner and the victim was a prison employee engaged at the time of the act in the performance of his duties;

6. The offender's act or acts of killing were intentional and resulted in multiple deaths;

7. The offender's act of killing was intentional and the victim was a state or local public official or police officer, sheriff, or deputy sheriff engaged at the time of the act in the lawful performance of his duties; and

8. The offender murdered the victim when an emergency protective order or a domestic violence order was in effect, or when any other order designed to protect the victim from the offender, such as an order issued as a condition of a bond, conditional release, probation, parole, or pretrial diversion, was in effect.

17. 1 Cooper, Kentucky Instructions to Juries (Criminal) § 12.06 (4th ed. Anderson 1999).

18. KRS 532.025(3).

19. KRS 532.025(2) (emphasis added).

20. 1 Cooper, Kentucky Instructions to Juries (Criminal) § 12.06 (4th ed. Anderson 1999).

21. 793 S.W.2d 802 (Ky.1990).

22. *Id.* at 805.

23. 50 S.W.3d 148 (Ky.2001).

24. *Id.* at 155.

element of intent to kill in KRS 507.020(1)(a) provides the statutory aggravating circumstance authorizing capital punishment for kidnapping. *St. Clair v. Roark,* Ky., 10 S.W.3d 482, 486–87 (1999).[25]

The line of reasoning in *Harris, Young,* and *St. Clair v. Roark* was reconfirmed in *Jacobs v. Commonwealth.*[26] *Jacobs* stated in *obiter dictum* that "*Harris* holds only that a defendant is death-eligible for the offense of capital kidnapping if he or she also murdered the kidnapping victim."[27] *Jacobs,* however, differs from the instant case in that it involved a death sentence for a murder conviction where kidnapping was the aggravating circumstance.[28]

Finally in *Salinas v. Commonwealth,*[29] this Court held that the fact that the victim was not released alive is not an aggravating circumstance authorizing capital punishment under KRS 532.025(2); rather it serves only to enhance the status of kidnapping from a Class A or B felony to a capital offense.[30] If the evidence on retrial is substantially the same, the jury shall be instructed that capital punishment may not be imposed unless the jury finds that St. Clair murdered Frank Brady during the course of the kidnapping.[31]

The second part of instruction number 3 was correct. The trial court properly concluded that St. Clair had a prior record of conviction for murder. In *St. Clair v. Commonwealth,*[32] we held that the proper application of KRS 532.025(2)(a)(1) is as follows:

In light of our construction of the KRS 532.025(2)(a)(1) aggravating circumstance, Appellant's allegations of error are easily resolved. First, we find that the aggravating circumstance satisfies the Constitutional demands and "provide[s] a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not," *Godfrey v. Georgia,* 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980) (*quoting Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring)). The statute not only provides "some 'common-sense core of meaning ... that criminal juries should be capable of understanding[,]' " *Tuilaepa,* 512 U.S. at 967, 114 S.Ct. 2630, 2632, 129 L.Ed.2d at 760 (*quoting Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976)) (White, J., concurring in judgment), but, in our view, contains clear objective standards from which a jury may determine a defendant's eligibility for a capital sentence. Simply put, KRS 532.025(2)(a)(1) does not permit "[t]he standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury," *Godfrey,* 446 U.S. at 429, 100 S.Ct. 1759, 1765, 64 L.Ed.2d at 407, which the constitution prohibits.

The trial court also correctly denied Appellant's motion for a directed verdict of acquittal with respect to the KRS 532.025(2)(a)(1) aggravating circumstance. Although the final judgments

25. *Young v. Commonwealth,* Ky., 50 S.W.3d 148, 155 (2001).

26. 58 S.W.3d 435 (Ky.2001).

27. *Id.* at 450–451.

28. *Id.* at 449.

29. 84 S.W.3d 913, 920 (Ky.2002).

30. *Id.*

31. *See* 1 Cooper, Kentucky Instructions to Juries (Criminal) § 12.06 (4th ed. Anderson 1999).

32. 140 S.W.3d 510 (Ky.2004).

were not entered in Appellant's first two Oklahoma Murder convictions until November 22, 1991, or approximately six (6) weeks after Brady's murder, Appellant acknowledged during his culpability phase testimony that he had been convicted of those two (2) counts of Murder following a trial.... Because these two (2) murder convictions demonstrated that Brady was murdered by "a person with a prior record of conviction for a capital offense," the trial court correctly denied Appellant's motion for a directed verdict as to the aggravating circumstance. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991).[33]

The determination of level of finality for a "prior record of conviction" under KRS 532.025(2)(a)(1) was determined to be an accepted guilty plea or a guilty verdict rendered by a judge or jury.[34] Our decision held that for the purposes of KRS 532.025(2)(a)(1) that a pending appeal does not impact the finality of the "prior record of conviction for a capital offense." [35] As a matter of law, St. Clair had two prior capital convictions for the 1991 murders before he committed the kidnapping. Therefore, on retrial, the jury should be instructed accordingly.

St. Clair also contends that the third aggravating circumstance in Instruction No. 3 of kidnapping while engaged in a first-degree robbery was not charged in the indictment, and that the definition of robbery in Instruction No. 4 misstated the aggravating circumstance. St. Clair also argues that he was entitled to a directed verdict of acquittal because he was convict-

ed of receiving stolen property thereby implicitly acquitting him of the greater offense of first-degree robbery.

■ It is well established that a felony such as first-degree robbery is a proper aggravating circumstance making one convicted of kidnapping death eligible.[36] We find no merit in St. Clair's contention that there was any error in the language of the instruction. The instruction mirrored the verbatim language of the model instruction as well as the language of the statute.[37] Moreover, there was no error in the inclusion of the definition of first-degree robbery as its inclusion aided the jury to determine whether a robbery had been committed. If on remand, the evidence is substantially similar, the same instruction on first-degree robbery as an aggravator should be given.

■ Likewise, we find no merit in St. Clair's argument that the Commonwealth was precluded from seeking the death penalty because the Hardin County Grand Jury's indictment did not identify the aggravating circumstances.

Although "a defendant cannot be made to face the sentencing phase of a capital trial unless he or she is first given sufficient notice of the Commonwealth's intention to seek the death penalty[,]" ... "[t]here is no authority supporting [Appellant's] claim that an aggravating circumstance must be described in the indictment." [38]

The Commonwealth complied with KRS 532.025(1)(a) by providing St. Clair with written notice of the evidence in aggrava-

---

**33.** *Id.* at 570–71.

**34.** *Id.* at 568–70.

**35.** *Id.* at 568–70.

**36.** *Dillard v. Commonwealth,* 995 S.W.2d 366, 374 (Ky.1999).

**37.** KRS 532.025(2)(a)(2); 1 Cooper, Kentucky Instructions to Juries (Criminal) § 12.06 (4th ed. Anderson 1999).

**38.** *St. Clair v. Commonwealth,* 140 S.W.3d at 560 (citations omitted).

tion that it intended to introduce. The indictment clearly stated that St. Clair was charged with capital kidnapping with the "intent to accomplish or advance the commission of a felony," i.e., first-degree robbery. KRS 532.025(1) only requires written notice of aggravating circumstances prior to trial.[39] On June 19, 1998, the Commonwealth filed its Notice of Intent to Seek Death Penalty. In January of 2001, Appellant was tried approximately two-and-a-half years after the Commonwealth filed its notice. Appellant's reliance on *Jones v. United States*[40] for the proposition that all aggravators must be alleged in the indictment is incorrect. *Jones* held that the elements of the offense charged must be alleged in the indictment, not sentencing considerations or penalty aggravators.[41] The indictment satisfies the requirements of RCr 6.10, and there was no error as to the indictment.

In addition to the claims of error addressed above, Appellant has asserted numerous other claims. Most asserted claims were not error, frivolous, or are not likely to recur upon retrial. However, we will address a few such claims of error that may recur upon retrial if the evidence is substantially similar.

### III. Various Other Claims

■ The first error likely to recur upon retrial is the introduction of the testimony of Mary Weedman about individuals coming and attempting to coerce her into talking with them. The Commonwealth inquired whether anyone at the defense table ever tried to coerce her to give a taped statement or to interview her. She responded that no one at that table had, but that "a blond headed lady and a man" pulled up to her house and flashed a badge and told her that if she did not talk they would get the sheriff to make her talk. St. Clair objected on hearsay grounds and the trial court sustained the objection. The Commonwealth continued questioning attempting to show a connection between the people who questioned Weedmen and St. Clair. At trial, St. Clair moved for a mistrial on the ground this testimony was irrelevant and prejudicial. Although the admission of this testimony would not warrant reversal, it was error and should not be admitted upon retrial.[42]

■ The second error concerned the admission of the transcript of Vernon Stephens preliminary hearing testimony in Oklahoma in March of 1992. The Commonwealth moved to admit the transcript under KRE 804(b)(1). In *St. Clair I*,[43] we held that as the offense occurred before the 1992 adoption and effective date of KRE 804(b)(1), it would be governed by the previous rule prohibiting introduction of prior testimony at a criminal trial unless the testimony was given at "a previous trial of the same offense . . . on the same charge."[44] Although we held the admission of such evidence harmless because it was cumulative of St. Clair's testimony, it was nonetheless error in this case and should be excluded.

■ Finally, we will address St. Clair's last valid assertion of error. He claims

**39.** *Garland v. Commonwealth*, 127 S.W.3d 529, 546 (Ky.2003).

**40.** 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

**41.** *Id.* at 1218, 1219.

**42.** KRE 401.

**43.** 140 S.W.3d 510, 536–537 (Ky.2004).

**44.** *St. Clair v. Commonwealth*, 140 S.W.3d 510, 536–537, citing RCr 7.22. *See also Commonwealth v. Bugg*, 514 S.W.2d 119, 121 (Ky. 1974); *Commonwealth v. Howard*, 665 S.W.2d 320, 323 (Ky.App.1984).

that when the Commonwealth asked Reese "was there any conversation that went on between St. Clair and Mr. Brady as you all drove that thirty minutes to an hour up to old Boston Road?" Defense immediately objected on hearsay grounds. A bench conference was held and the trial judge allowed Reese to testify on the grounds that Brady's declaration was subject to the dying declaration exception in KRE 804(b)(2). Reese testified that Brady said he had a daughter in college and that she was home for the weekend. Brady also talked about his wife. The Commonwealth asked what Brady had said about his wife and Reese answered, "He was wanting to go back home."

Upon this appeal, the Commonwealth responds by noting that Reese testified that Brady told St. Clair that he wanted to go home to his family. The Commonwealth claims that this testimony was being used to show that Brady was being held against his will. The Commonwealth posits that this was admitted to show the topic of conversation not what Brady actually said. In support, the Commonwealth cites *Wilson v. Commonwealth* [45] for the proposition that evidence showing that a victim had begged for his life is always admissible. However, in *Wilson*, we neither addressed hearsay nor discussed the dying declaration exception. We note that this argument is novel to this appeal and was not argued at trial.

This testimony was not admissible as a dying declaration because the statements did not concern the impending causes of the victim's death, and it is not clear that the victim was aware of his impending

death.[46] It is well settled that statements may be admitted to show the declarant's state of mind, and testimony showing a declarant's state of mind, *e.g.,* fear, is admissible. However, the testimony concerning Brady's daughter and his desire to go home was inadmissible hearsay and should have been excluded from trial.

For the forgoing reasons, we reverse and remand.

As to part I, COOPER and JOHNSTONE, JJ., concur.

ROACH, J., concurs by separate opinion; and WINTERSHEIMER, J., dissents by separate opinion in which GRAVES and SCOTT, JJ., join.

As to part II, all concur except COOPER, J., who dissents by separate opinion.

As to part III, all concur.

Concurring opinion by Justice ROACH.

I join Parts II and III of the majority opinion. As to Part I, I concur with the majority's conclusion that it was error to admit statements two and three as they were privileged marital communications, pursuant to KRE 504. I agree with the majority that the admission of statement two mandates reversal of the case. However, I believe the admission of statement three amounted to harmless error and I would not reverse the case on that ground.

Opinion by Justice COOPER, concurring in part and dissenting in part.

I agree that this case must be reversed because of introduction of evidence in vio-

**45.**   836 S.W.2d 872 (Ky.1992).

**46.**   *Turner v. Commonwealth,* 5 S.W.3d 119, 121 (Ky.1999) (holding that to qualify for a dying declaration exception a party must show that (1) the declarant is unavailable as a witness as defined in KRE 804(a); (2) the declaration was made at a time when the declarant believed death was imminent; (3) the declaration concerned the cause or circumstances of what the declarant believe to be the impending cause of death).

lation of the marital privilege and concur in the majority opinion in that respect. However, I dissent from the majority opinion insofar as it permits the use of Appellant's 1991 convictions to support the aggravating circumstance defined in KRS 532.025(2)(a)(1) for the same reasons set forth in my dissenting opinion in *St. Clair v. Commonwealth,* 140 S.W.3d 510, 574–75 (Ky.2004) (*"St. Clair I "*). Specifically, in *Thompson v. Commonwealth,* 862 S.W.2d 871 (Ky.1993), *superseded on other grounds by* RCr 9.38, we held that a prior conviction of a capital offense that was not final because it was still on appeal at the time the subsequent capital offense was committed could not be used to prove the aggravating circumstance defined in KRS 532.025(2)(a)(1). *Id.* at 877. In *St. Clair I,* the majority of this Court overruled *Thompson* and held that a "conviction" occurs upon "a plea of guilty accepted by the trial court or a jury's or judge's verdict [sic] of guilty." 140 S.W.3d at 570. I agreed that *Thompson* was wrongly decided and should be overruled. *Id.* at 574. However, the majority opinion went further and retroactively applied the overruling of *Thompson* to St. Clair, whose offenses occurred after *Thompson* was decided and (of course) before *Thompson* was overruled. *Id.* at 571.

The "fair warning" aspect of the Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the retroactive application of an unforeseeable change in the construction of a statute to subject a person to criminal liability *or increased punishment* for past conduct. *Bouie v. City of Columbia,* 378 U.S. 347, 354–55, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964); *Dale v. Haeberlin,* 878 F.2d 930, 934 (6th Cir.1989) ("We hold that the constitutional due process protections, like *ex post facto* protections, do extend to proscribe judicially enforced changes in inter-

pretations of the law that unforeseeably expand the punishment accompanying a conviction beyond that which an actor could have anticipated at the time of committing a criminal act."). *See also St. Clair I,* 140 S.W.3d at 575 (Cooper, J., dissenting) (citing other federal cases on this issue). The overruling of *Thompson* was a change in our interpretation of KRS 532.025(2)(a)(1) that unforeseeably expanded the punishment accompanying St. Clair's conviction, *i.e.,* made applicable to St. Clair an aggravating circumstance authorizing imposition of capital punishment, which otherwise would have been precluded by *Thompson.*

Accordingly, I dissent.

Dissenting Opinion by Justice WINTERSHEIMER.

I must respectfully dissent from the majority opinion because there was no error on the part of the trial judge in permitting the testimony of the ex-wife concerning communications between the accused and her during his escape and other patently criminal activities. The majority opinion construes the marital privilege too broadly.

The marital communications privilege does not apply in this situation because the communications involved aiding St. Clair in patently criminal activity and because the communications sought to be privileged were likely intended to be shared with a third party. Furthermore, the wife's testimony has substantial probative value thereby outweighing the minimal prejudicial effect.

Thus, the majority has interpreted the confidential marital communications privilege too broadly. Privileges are to be interpreted narrowly. *United States v. Porter,* 986 F.2d 1014, 1018 (6th Cir.1993). *Porter, supra,* states that "privileges must be strictly construed and accepted 'only to

the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominate principle of utilizing all rational means for ascertaining truth.'" 986 F.2d at 1019 *citing Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *United States v. Nixon,* 418 U.S. 683, 709–10, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

In concluding that statements two and three were confidential, the majority opinion fails to analyze whether the information shared between St. Clair and his wife were "not intended for disclosure to any other person." KRE 504(b). Because St. Clair and Reese escaped and stole a pickup truck together, it is reasonable to infer that they made plans on securing the means to continue their escape. For instance, communications to the wife concerning the need for clothing, money, and other items would be expected to be non confidential because St. Clair would tell Reese from where aid to their escape would come. Accordingly, statements from St. Clair to his wife concerning his and Reese's location, future location, and plans would also fail the "not intended for disclosure to another person" test because Bylynn was a source of aid to them.

KRE 504(c)(1) states that the privilege is excepted "in any criminal proceeding in which sufficient evidence is introduced to support a finding that the spouses conspired or acted jointly in the commission of the crime charged." The majority interprets this to mean that Bylynn must have directly aided in receiving stolen property, criminal attempt to commit murder, or second-degree arson. It is arguable whether aiding and abetting the escape results in conspiring for the purposes of rendering the privilege. *Gill v. Commonwealth,* 374 S.W.2d 848 (Ky.1964) states, "when husband and wife are co-conspirators, or when the evidence justifies such a conclusion, a declaration of the husband or wife at the time of the act in question is not privileged". Certainly, under the situation described in these facts, the wife became some part of the criminal activities by her assistance. Furthermore, this analysis is more consistent with the 6th Circuit's interpretation of the joint participation exception to the confidential marital communications privilege. *See United States v. Sims,* 755 F.2d 1239 (6th Cir. 1985) (Exception to privilege for confidential marital communications arising out of joint criminal activity exists for conversations that pertain to patently illegal activity.). Even though this part of the analysis may be a close call in this case, the communications were not confidential.

The majority opinion states that the evidence of the wife's testimony would be prejudicial. This analysis is incorrect under KRE 403. KRE 403 disallows evidence whose prejudicial value outweighs the probative value. Because her testimony corroborated some other evidence, and especially because her testimony was the critical key to place St. Clair in Kentucky at the time of the criminal commissions, it has significant probative value. Accordingly, the trial judge did not err in admitting the testimony after disallowing the confidential marital communications privilege to apply.

Therefore, there was no confidential marital communications privilege here. The trial judge properly instructed the jury. I would affirm the conviction in all respects.

GRAVES and SCOTT, JJ., join this dissent.