MODIFIED: SEPTEMBER 23, 2010
RENDERED: APRIL 22, 2010
TO BE PUBLISHED

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

### 2005-SC-000828-MR

MICHAEL DALE ST. CLAIR                                          APPELLANT

ON APPEAL FROM BULLITT CIRCUIT COURT
V.           HONORABLE THOMAS WALLER, JUDGE
NO. 92-CR-00010-002

COMMONWEALTH OF KENTUCKY                              APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**REVERSING AND REMANDING**

Michael St. Clair was convicted of capital murder and sentenced to death. On appeal, this Court affirmed his capital murder conviction but reversed his death sentence and remanded the case to the trial court for a new capital sentencing trial.[1] Following the new sentencing trial, St. Clair was again sentenced to death. This appeal followed.

We now must reverse the death sentence imposed following the new sentencing trial because the trial court failed to comply with this Court's directive to follow the statutory language in instructing the jury on the applicable aggravator required to support a death sentence. The trial court instead fashioned an erroneous jury instruction that deprived St. Clair of his

---

[1] *St. Clair v. Commonwealth*, 140 S.W.3d 510, 572 (Ky. 2004). We will occasionally refer to our opinion on St. Clair's first appeal of his capital murder conviction and death sentence as "*St. Clair I*" for the sake of clarity.

right to a unanimous verdict. Although we reverse solely on this issue, we also address other issues raised in this appeal that are likely to recur upon remand.

## I. FACTS.

The facts underlying St. Clair's murder conviction appear in detail in our opinion on his first appeal. Briefly summarized, the facts are that St. Clair and a co-defendant, Dennis Reese, were indicted for the 1991 murder of Frank Brady in Bullitt County, Kentucky.

Brady was shot and killed just a few weeks after St. Clair and Reese escaped from an Oklahoma jail where St. Clair was awaiting sentencing after a jury there convicted him of two murders. During the weeks between the escape and Brady's murder, St. Clair and Reese travelled widely across the southwestern United States on a crime spree that included the kidnapping and murder of Timothy Keeling. Eventually, they reached Hardin County, Kentucky, where they kidnapped Frank Brady and took his pickup truck. Reese and St. Clair set fire to Keeling's truck to destroy incriminating evidence and took Brady into a secluded area of Bullitt County, where he was shot execution-style.[2] Soon after this murder, a Kentucky state trooper stopped Reese and St. Clair in Brady's vehicle in Hardin County; and St. Clair fired shots at the trooper's vehicle.[3] Reese and St. Clair fled the scene and soon parted ways.

---

[2] *Id.* at 524.

[3] St. Clair was tried in Hardin County for various offenses, including attempted murder, arson, and capital kidnapping. He was found guilty and sentenced to death by the Hardin Circuit Court. We reversed and remanded due to various errors in *St. Clair v. Commonwealth*, 174 S.W.3d 474 (Ky. 2005) (Hardin County case).

2

After St. Clair and Reese were jointly indicted in Bullitt County for Brady's murder, Reese pled guilty and agreed to testify against St. Clair. St. Clair pled not guilty, and a trial ensued in which St. Clair testified and claimed an alibi defense. The primary factual issue at trial was whether Brady had been killed by St. Clair, Reese, or an unidentified accomplice. The jury convicted St. Clair of the murder, and the trial court sentenced St. Clair to death in accordance with the jury's recommendation.[4] Although we affirmed the conviction, we remanded for a new capital sentencing phase trial.

## II. WE MUST REVERSE BECAUSE TRIAL COURT ERRED IN NOT CONFORMING WITH STATUTORY LANGUAGE IN INSTRUCTING JURY ON AGGRAVATOR.

This case must be reversed and sent back again for re-sentencing because the trial court failed to comply with this Court's clear directive to instruct the jury on the germane aggravating circumstance in conformance with the statutory language describing this aggravating circumstance. In *St. Clair I*, we reversed because the trial court failed to instruct the jury on the availability of life without parole (LWOP) as a sentencing option. *St. Clair I* also addressed other issues likely to recur on remand, including proper jury instructions concerning the statutory aggravating circumstance at issue here, which is described in Kentucky Revised Statutes (KRS) 532.025(2)(a)(1): "[t]he offense of murder or kidnapping was committed by a person with a prior record

---

[4] *St. Clair I*, 140 S.W.3d at 524-25.

3

of conviction for a capital offense . . . ."[5] Specifically, we directed the trial court to follow this statutory language in instructing the jury on this aggravator.[6]

In the first appeal, St. Clair argued, "that the trial court's capital sentencing phase jury instructions erroneously reformulated the KRS 532.025(2)(a)(1) aggravating circumstance."[7] The trial court's instruction on aggravating circumstances in the penalty phase of the first trial stated as follows:

> In fixing a sentence for the Defendant for the offense of murder, you shall consider the following aggravating sentence which you may believe from the evidence beyond a reasonable doubt to be true:
>
> 1. The Defendant has a prior record of conviction for murder, a capital offense.

And this Court concluded, "[g]iven our construction of the KRS 532.025(2)(a)(1) aggravating circumstance, we agree with [St. Clair's] contention that the trial court's articulation of that aggravating circumstance changed its meaning."[8] In the opinion, we explained that the statutory language required that the defendant actually have the prior record of conviction for a capital offense at the time the instant offense of murder (or kidnapping) was committed: "We find KRS 532.025(2)(a)(1) susceptible to but one natural and reasonable construction: the aggravating circumstance is implicated only when the defendant has already been convicted of a capital offense prior to the

---

[5] We recognize that KRS 532.025(2)(a)(1) also recognizes another aggravator for cases where "the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions[,]" which is not at issue before us now.

[6] *St. Clair I*, 140 S.W.3d at 571.

[7] *Id.* at 563.

[8] *Id.* at 571.

4

commission of the present capital offense."[9] This Court directed that: "Upon remand, the trial court should instruct the jury in accordance with the statutory language, *i.e.* 'the murder was committed by a person with a prior record of conviction of a capital offense.'"[10] Now, despite our directive to follow the statutory language of KRS 532.025(2)(a)(1), we again face an improper jury instruction on the same aggravating circumstance.

This time, the trial court's instruction asked the jury to determine whether the following aggravator was established: "[t]he murder was committed by the Defendant and the Defendant has a prior record of conviction of murder, a capital offense." As St. Clair argues, this instruction did not require the jury to find that St. Clair had a capital conviction at the time the Brady murder was committed. This issue was properly preserved in the second sentencing trial by St. Clair's tendering a jury instruction that tracked precisely the statutory language of KRS 532.025(2)(a)(1):

> In fixing a sentence for the Defendant for the offense of Murder, you shall consider the following aggravating circumstance which you may believe from the evidence beyond a reasonable doubt to be true:
> (1)     The offense of murder was committed by a person with a prior record of conviction for a capital offense.

This Court explained in the first appeal that the statutory language required that the defendant actually have the prior record of conviction for a capital offense *at the time the instant offense of murder (or kidnapping) was*

---

[9] *Id.* at 568.

[10] *Id.* at 571.

*committed.*[11] And we agree with St. Clair that the trial court's instruction at issue in this appeal could erroneously allow a jury to find this aggravating factor even if the defendant did not have a prior record of conviction of a capital offense *at the time the instant offense was committed* but, simply, had accrued such a prior record of conviction by the time of trial. Because the jury was presented with evidence of many convictions for capital offenses, some of which pre-dated the commission of the Brady murder and some of which did not, one cannot determine whether the jury based its finding of this aggravator on a qualifying or a non-qualifying conviction. So the trial court's instruction not only failed to follow this Court's explicit directive following the first appeal, but the instruction, as given, deprived St. Clair of his right to a unanimous verdict. And "the denial of a unanimous verdict — where the error is properly preserved — is not subject to a harmless error analysis."[12]

As Justice Scott points out in his dissent on this issue, at first glance, it may appear that we approved a similarly worded instruction in our opinion reversing St. Clair's Hardin County capital kidnapping conviction, despite our disapproval of the instruction given by the trial court in this appeal and the previous appeal of the Bullitt County murder conviction.[13] In the Hardin County case, we authorized the trial court to instruct the jury on the

---

[11] *Id.* at 568 ("We find KRS 532.025(2)(a)(1) susceptible to but one natural and reasonable construction: the aggravating circumstance is implicated only when the defendant has already been convicted of a capital offense prior to the commission of the present capital offense.").

[12] *Burnett v. Commonwealth,* 31 S.W.3d 878, 883 (Ky. 2000).

[13] *See* Hardin County case, 174 S.W.3d at 483 ("The second part of instruction number 3 was correct. The trial court properly concluded that St. Clair had a prior record of conviction for murder."). The second part of instruction number 3 stated: "The Defendant has a prior record of conviction for Murder, a capital offense." *Id.* at 481.

aggravator at issue; and, despite any imprecise language, we did not intend to retreat from the direction to follow statutory language in fashioning an instruction on this aggravator, which we clearly made in our opinion on the original appeal in St. Clair's Bullitt County murder case. We note that a possible inconsistency was not raised by the parties in the case now before us.

Any apparent inconsistency between our resolutions of jury instruction issues in the Hardin County case versus the Bullitt County case must be resolved in favor of enforcing the directions we gave to the Bullitt Circuit Court upon remand in the original appeal *in this case*, however. Our 2005 opinion in the Hardin County kidnapping appeal was rendered after our 2004 opinion in the original appeal of the present case and explicitly took note of our resolution of this issue.[14] But our opinion in the Hardin County appeal did not overrule, limit, or modify in any way our opinion rendered in the original appeal in this case. So it is obvious that despite our unfortunately imprecise language, we did not intend for there to be any discrepancy between those opinions. Instead, we merely intended to inform the Hardin Circuit Court upon remand that it could properly instruct the jury to consider whether it found the aggravating circumstance identified in KRS 532.025(2)(a)(1) ("The offense of murder or kidnapping was committed by a person with a prior record of conviction for a capital offense"). The propriety of offering such an instruction on this particular aggravator was supported by evidence of qualifying convictions of capital offenses, namely the 1991 murder convictions.

---

[14] *Id.* at 483-84, *citing St. Clair I,* 140 S.W.3d at 568-71 (noting holdings in original appeal that aggravator at issue was not unconstitutionally vague, that directed verdict motion on this aggravator was properly denied, and that a jury's verdict of guilt was sufficient "prior record of conviction for a capital offense.").

In stating that "[a]s a matter of law, St. Clair had two prior capital convictions for the 1991 murders before he committed the kidnapping[,]"[15] we perhaps inartfully tried to state that any finding of the aggravator at issue could be based upon evidence of the 1991 murder convictions (and perhaps implicitly suggested that such a finding could not be based upon evidence of the 1994 murder convictions). Obviously, while reversing St. Clair's Hardin County capital kidnapping conviction on other grounds, we tried briefly to offer some guidance on penalty phase jury instructions in our opinion in that case, covering three different aggravators in just a few pages and not explicitly discussing how the trial court should deal with the 1994 murder convictions in its penalty phase instructions.[16]

To the extent that the guidance concerning penalty phase instructions provided to the Hardin Circuit Court in the capital kidnapping case might seem inconsistent with the more specific analysis and directions given to the Bullitt Circuit Court in our opinion on the first appeal of this case, obviously, the more specific analysis and directions provided given to the same trial court (the Bullitt Circuit Court) must prevail. In other words, the Bullitt Circuit Court was not excused from following our previous clear directions to it by any failure of ours to provide similarly specific and explicit directions on remand to a different trial court in a different case involving the same defendant.

Although the members of this Court may well conclude from our own review of the evidence that the statutory aggravator is adequately proven, the United States Supreme Court has made clear that such a judicial finding of an

---

[15] Hardin County case, 174 S.W.3d at 484.

[16] *See id.* at 481-84.

aggravator does not satisfy Constitutional requirements. Rather, such a finding must be made by a properly instructed jury to satisfy the Sixth Amendment.[17] Thus, with all due respect to our dissenting colleagues, we cannot affirm a death sentence based upon a finding of harmless error where the jury has not properly been instructed.

In addition to the statutory definition of the aggravator at issue, St. Clair's tendered instruction in the second sentencing trial also instructed the jury that: "You are further instructed that the Defendant's convictions in Choctaw County, Oklahoma[,] in 1994 (CRF-90-145) do not meet the statutory criteria for consideration as an aggravating circumstance." We reject St. Clair's proposal for this additional language.

The better course would be to identify specifically the one or more convictions that *could* qualify as a "prior record of conviction for a capital offense" to avoid any possibility that the jury's verdict is not unanimous. For example, a proper instruction could read:

> In fixing a sentence for the Defendant for the offense of Murder, you shall consider the following aggravating circumstance, which you may believe from the evidence beyond a reasonable doubt to be true:
>
> (1)    The offense of murder was committed by a person with a prior record of conviction for a capital offense:  the September 1991 Murray County, Oklahoma,

---

[17] *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (holding that Sixth Amendment requires that jury, not sentencing judge, must find aggravating factors that would subject defendant to imposition of death penalty because such aggravating factors "operate as 'the functional equivalent of an element of a greater offense' . . . .").

9

conviction for the first-degree murder of William Henry
Kelsey, Jr.[18]

By specifically identifying qualifying convictions that can be used as
aggravators, the trial court ensures that the jury may not rely on convictions
that could not qualify. In the present case, for instance, the 1994 Choctaw
County, Oklahoma, convictions for the first-degree murders of Mary Louise
Smith and Edward Jefferson Large would not qualify because those convictions
occurred after Brady's murder. In the analogous situation of persistent felony
offender jury instructions, specific felony convictions are identified to ensure
that the jury has relied on a felony conviction qualified for PFO considerations.
For example, *1 COOPER, KENTUCKY INSTRUCTIONS TO JURIES (CRIMINAL)* § 12.29
recommends that part of a second-degree persistent felony offender jury
instruction would instruct a jury to find whether:

> A.    That prior to (date of present offense), the Defendant
> was convicted of _____ (ID felony) by final judgment[19] of the
> _____ (ID court) on _____ (date-2 [of judgment]).

To avoid any possibility that the jury has relied upon a non-qualifying
conviction in finding the aggravator at issue here, we hold that in this case and
in any similar future cases, the jury instruction must require the jury

---

18 In the alternative, "Ronnie St. Clair" could be substituted for "William Henry Kelsey,
Jr." St. Clair was convicted for both the first-degree murder of William Henry
Kelsey, Jr., and the first-degree murder of Ronnie St. Clair by a Murray County,
Oklahoma, jury verdict in September 1991, before the murder of Frank Brady in
Kentucky in October 1991. In *St. Clair I*, we held that a jury verdict of guilt was
enough to establish a conviction for purposes of KRS 532.025(2)(a)(1). 140 S.W.3d
at 570. The judgment of the trial court sentencing St. Clair for the murders of
Kelsey and Ronnie St. Clair was not entered until November 1991 — after the Brady
murder had already occurred in Kentucky. *Id.*

19 We held in *St. Clair I* that a final judgment was not required to satisfy the
"conviction" requirement of the aggravator at issue here, 140 S.W.3d at 570; we
decline to hold here whether such a "final judgment" requirement is proper in the
context of PFO proceedings or express any opinion on the propriety of the PFO form
instructions quoted here.

10

specifically to identify the conviction that the jury uses to find this particular aggravator: "[t]he offense of murder or kidnapping was committed by a person with a prior record of conviction for a capital offense . . . ."[20]

Because the trial court's instruction on the particular statutory aggravator at issue here did not follow this Court's specific directive to conform to the statutory language and did not ensure that a finding of the aggravator was unanimously made by the jury based on a qualifying prior conviction for a capital offense, we must vacate St. Clair's death sentence and remand for re-sentencing.

### III. WE ADDRESS OTHER ISSUES LIKELY TO RECUR UPON REMAND.

#### A. Trial Court was not Required to Give Instruction on Non-Statutory Mitigation Factor of Brain Damage.

St. Clair contends the trial court committed reversible error in not instructing the jury that it must consider the non-statutory mitigating factor of his alleged brain damage. To that end, he tendered an instruction that required the jury to consider brain damage as a factor in mitigation. He acknowledges that the trial court's mitigation instruction did ask the jury to consider whether the statutory mitigation factor of mental illness or retardation or intoxication was shown even though he contends there was no proof on these factors. But he argues that the trial court's instruction may have led jurors to believe they were prohibited from considering his brain damage as a

---

[20] KRS 532.025(2)(a)(1).

mitigating factor. Having reviewed the trial court's mitigation instruction,[21] however, this Court rejects the argument that the trial court's instruction prohibited the jury from considering St. Clair's claimed brain damage. The instruction explicitly allowed the jury to consider "such mitigating or extenuating facts and circumstances as have been presented to you in the evidence as you believe to be true." Although brain damage not resulting in mental illness or retardation was not explicitly mentioned in the instruction,[22] this Court, nonetheless, disagrees with St. Clair's argument that this instruction prohibited the jury from considering such evidence as mitigation. In fact, the instruction would allow the jury to consider a broad range of extra-statutory factors as mitigation.[23] Precedent states that "[t]here was no need to

---

[21] The trial court's instruction on "Mitigating Circumstances" stated as follows:

> In fixing a sentence for the Defendant for the offense of MURDER, you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence as you believe to be true. You shall consider those aspects of the Defendant's character, and those facts and circumstances of the particular offense of which he has been found guilty, which you believe from the evidence to be true.

> You shall also consider whether:

> At the time of the capital offense, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness or retardation or intoxication even though the impairment of the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is insufficient to constitute a defense to the crime.

[22] Some authority seems to recognize that brain damage not resulting in mental retardation or legal insanity may be considered as a mitigating factor but does not demand that this factor be given much weight. *See, e.g., Robinson v. State*, 761 So.2d 269, 277 (Fla. 1999) (upholding death sentence and finding no abuse of discretion in trial court's considering, but giving little weight to, expert evidence that defendant had suffered brain damage because of lack of evidence that brain damage led to crime).

[23] In closing argument, defense counsel urged the jury to take into consideration evidence of St. Clair's brain damage.

instruct on any specific nonstatutory mitigators" where the trial court gave a similarly broad instruction on mitigation.[24]

St. Clair's tendered instruction would have directed the jury to consider evidence of his brain damage as a mitigating factor.[25] But this proposed language overstepped the bounds of proper jury instructions because the jury was not required to accept evidence of brain damage as mitigating. The jury needed to resolve (1) whether it accepted this evidence as true and, if so, then (2) whether the type of brain damage proven actually reduced St. Clair's culpability or indicated that he should not receive the death penalty. In sum, the lack of explicit mention of this particular non-statutory mitigating factor in the trial court's mitigation instruction was not error.

We decline to address St. Clair's remaining sentencing instruction issues because they were addressed by *St. Clair I*, resolved by precedent, or are unlikely to recur upon retrial.

### B. *Faretta* Hearing Considerations.

---

[24] *Tamme v. Commonwealth*, 973 S.W.2d 13, 37 (Ky. 1998) ("The instruction on mitigating circumstances included the catch-all provisions, 'any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value,' and 'those aspects of the defendants' character and the facts and circumstances of the offense about which he has offered evidence in mitigation.'").

[25] St. Clair's tendered instruction on mitigating circumstances stated, in pertinent part: "You are instructed to consider as a mitigating circumstance the evidence you heard concerning Michael St. Clair's brain damage. Kentucky law requires the consideration of a mitigating circumstance in situations where the capacity of the defendant to appreciate the criminality of his conduct was impaired as a result of mental illness or retardation or intoxication even though the impairment of the capacity of the defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of the law is insufficient to constitute a defense to the crime."

13

Because we reverse on other grounds, we decline to resolve whether, as St. Clair argues, the trial court erred by failing to conduct a *Faretta*[26] hearing while at the same time effectively allowing St. Clair to act as co-counsel. We gather from the record that there was confusion at times concerning the role that St. Clair wished for himself and his attorneys to play. At one point, he asked the trial court to designate him as "lead counsel" and referred to himself as "pro se lead counsel" in pleadings submitted to the trial court. He later withdrew the motion to be designated lead counsel. But despite his stating to the trial court that he wished to continue to be represented at trial by appointed counsel, St. Clair continued to file what he termed "pro se" motions. And St. Clair was even allowed to argue some "pro se" motions to the trial court, although he never questioned witnesses or made arguments to the jury.

In response to the Commonwealth's inquiries about whether St. Clair might wish to proceed pro se or with hybrid representation, St. Clair stated that he did not want to represent himself and that he wished to remain represented by counsel. But he apparently never directly stated whether or not he desired hybrid representation, which would entail his making a limited waiver of counsel and accepting representation only as to certain matters in the

---

[26] Where a criminal defendant desires to represent himself at trial rather than be represented by an attorney, the trial court must hold a hearing to determine if his waiver of his right to counsel is knowing, voluntary, and intelligent. *Faretta v. California*, 422 U.S. 806, 835 (1975). This Court held in *Hill v. Commonwealth*, 125 S.W.3d 221, 226-27 (Ky. 2004), that where a criminal defendant desires to make a limited or a full waiver of counsel, the trial court must hold a *Faretta* hearing to determine whether the waiver of right to counsel is made knowingly, voluntarily, and intelligently.

14

case.[27] Whether St. Clair chooses to elect hybrid representation can be more clearly ascertained by the trial court upon remand.

In any event, upon remand, we would remind the trial court and the parties that should St. Clair make an unequivocal request to proceed pro se or with hybrid representation — in other words, to make either a full or a limited waiver of his right to counsel — under our precedent, a *Faretta* hearing is required.

### C. Generally, Defendant's Guilt-Phase Testimony From First Trial Not Per Se Inadmissible in Re-sentencing Trial.

We decline to address whether the reading of transcripts of St. Clair's trial testimony from the original trial at the re-sentencing trial was forbidden by order or agreement because this issue is not a relevant issue on remand. But because the general admissibility of St. Clair's guilt-phase testimony from the first trial is likely to be an issue again, we will address the general question of whether a defendant's guilt-phase trial testimony may be admissible during a re-sentencing trial.

We held that a defendant's testimony from an earlier trial is admissible upon retrial in *Sherley v. Commonwealth*.[28] As St. Clair points out, *Sherley* involved a retrial of the guilt phase; whereas, this case was sent back for a

---

[27] Kentucky's courts, unlike some other courts, recognize that a criminal defendant may make a limited waiver of counsel and accept representation only on certain matters. *Wake v. Barker*, 514 S.W.2d 692 (Ky. 1974). This limited waiver of counsel is sometimes known as "hybrid representation." This Court held that where a criminal defendant desires to make a limited waiver of counsel, a "*Faretta*" hearing must be conducted to determine whether this limited waiver is made knowingly, voluntarily, and intelligently. *Hill*, 125 S.W.3d at 226-27.

[28] 889 S.W.2d 794, 798 (Ky. 1994).

penalty phase trial. Regardless, St. Clair waived his Fifth Amendment rights against self-incrimination by testifying at the first trial.

Although we have not specifically addressed the admissibility of a defendant's testimony given during the guilt phase of the first trial when offered in re-sentencing procedures, we did set some parameters on the presentation of proof during a re-sentencing proceeding in *Boone v. Commonwealth.*[29] We acknowledged in *Boone*, "common sense dictates that the second jury must be told something about what transpired during the earlier guilt phase" of the first trial when a case is remanded solely for the purposes of re-sentencing.[30] So such matters as the charges in the indictment, the trial court's instructions to the jury, and the jury's verdict in the first trial should be admitted.

For practical considerations, this Court has refrained from requiring "a complete reading to the jury of a verbatim transcript or the projection of a [full] videotaped record of the guilt phase" and has suggested that, where possible, the parties agree to present summaries of some portions of the original trial testimony.[31] Nonetheless, while encouraging summaries for the sake of expediting re-sentencing trials, this Court does not require that summaries always be presented in lieu of live testimony, reading transcripts of prior trial testimony, or playing videotapes of prior trial testimony. As we recognized in a case addressing the admittedly somewhat distinct issue of what kind of evidence could be admitted upon re-sentencing in guilty plea cases, *Boone* does

---

[29] 821 S.W.2d 813 (Ky. 1992).

[30] *Id.* at 814.

[31] *Id.*

not establish rigid limits on the type of evidence that must be presented but recognizes broad discretion on the part of the trial court in determining the admissibility of evidence in re-sentencing.[32]

Applying this same abuse-of-discretion standard that we apply in reviewing other evidentiary decisions by trial courts, we find no abuse of discretion in the trial court's denying St. Clair's motion to exclude his earlier trial testimony.[33] Clearly, much of this testimony was relevant for providing background information on the crime; for hearing St. Clair's explanation of what had happened; and for assessing aggravating and mitigating circumstances, both statutory and non-statutory. Naturally, on remand, the

---

[32] *Thompson v. Commonwealth*, 147 S.W.3d 22, 36-37 (Ky. 2004) (in rejecting defendant's claim that prosecution was limited under *Boone* to provide only evidence describing the crime and its elements and his guilty plea to the crime, stating that:

> "While the types of admissible evidence delineated in *Boone* are guidelines for the trial court, we do not agree with Appellant that *Boone* should be read as a strict limitation on the types of evidence admissible in a penalty phase trial where the defendant has pled guilty. Nor does *Boone* itself purport to create such a strict limitation: the Court in *Boone* provided a list of what types of evidence 'might be pertinent.' Here, because no guilt phase trial occurred, the types of admissible evidence set forth in *Boone* alone were insufficient in this case to adequately apprise the jury of the nature of Appellant's crimes. As noted in *Boone* itself, the sentencing jury cannot be expected to fix punishment 'in a vacuum without any knowledge of the defendant's past criminal record or other matters that might be pertinent to consider in the assessment of an appropriate penalty.' With that principle in mind, the trial court must use its discretion in admitting relevant evidence that will sufficiently inform the jury of the crimes committed, while avoiding undue prejudice.").

(Footnotes omitted). *See also Neal v. Commonwealth*, 95 S.W.3d 843, 851 (Ky. 2003) (in re-sentencing trial, trial court did not abuse its discretion in presenting an edited version of videotapes from the guilt phase of the first trial since parties were unable to agree on summaries in an effort to give the jury some information about the crime committed.).

[33] The defendant's guilt phase testimony from the first trial should not be excluded as hearsay. *See* Kentucky Rules of Evidence (KRE) 801(c) (defining *hearsay* as statements "other than one made by the declarant while testifying at the trial or hearing . . . ."); KRE 801A(b)(1) (hearsay exception for parties' own statements).

parties may argue to the trial court whether specific portions of St. Clair's trial testimony should be redacted for various reasons; but, generally, we cannot say the entirety of his guilt-phase testimony from the first trial is inadmissible.

D. No Abuse of Discretion in Sustaining Objection to Reference to Executive Agreement in Opening Statement and in Excluding Executive Agreement.

St. Clair argues that the trial court erred in sustaining the Commonwealth's objection to defense counsel's mention in opening statement of a 1995 executive agreement between the then-governors of Kentucky and Oklahoma. He also seems to argue that the executive agreement should have been admitted into evidence because he contends it was relevant to mitigation. We reject both arguments.

The issue of whether the jury should be made aware of the executive agreement arose during defense counsel's opening statement. Defense counsel informed the jury that St. Clair had already received four consecutive life-without-parole sentences in Oklahoma and then stated "[y]ou will also hear that by agreement entered into in 1995, between the governors of Oklahoma and Kentucky, if you sentence Michael to anything . . . ." The Commonwealth then interrupted to request a bench conference at which it objected to any reference to the 1995 executive agreement.

The Commonwealth argued that the agreement was irrelevant to the current re-sentencing proceeding because the agreement did not concern St. Clair's personal culpability and arose from "an extrajudicial proceeding," which the Commonwealth contended "has no place in a judicial sentencing hearing." The defense argued it was mitigating and relevant to whether St. Clair would pose an escape risk and further contended that the Supreme

18

Court had accepted the interstate detainer agreement as enforceable. Defense counsel further explained that the document was not admitted into evidence in the first trial, despite defense counsel's intention to introduce it as mitigation evidence, because St. Clair declined to present mitigation evidence at the first trial. After the party's arguments, the trial court sustained without further comment the objection to the reference to the executive agreement in opening statement.

Defense counsel later introduced the 1995 executive agreement document through the avowal testimony of the Bullitt Circuit Clerk, who read portions of the agreement into the record.[34] Rather than re-submitting the document into evidence, defense counsel referred to where the document had been placed in the written record prior to the first trial. Unfortunately, although we came across the avowal testimony itself, we are unaware of whether there was any more discussion in the trial court regarding the document's possible evidentiary value other than the previously mentioned bench conference. Having reviewed both the executive agreement itself (as presented in avowal testimony), as well as the parties' arguments concerning

---

[34] St. Clair's brief did not reference this avowal testimony or otherwise show where he actually preserved the issue of admissibility of this document by citing to the record to show where he tried to have the document admitted into evidence. Instead, we independently discovered this avowal testimony through our own review. Our fortuitous discovery of this avowal has enabled this Court to review the 1995 executive agreement and determine whether it might actually be relevant to sentencing. We address the issue of whether the executive agreement had any possible relevancy here in the interest of thoroughness in this death penalty appeal. As we do so, we reiterate that this Court will not search the record to discover whether issues on appeal were presented to the trial court; rather, parties must be responsible for citing to the record to show where issues are preserved for review. *See, e.g., Copley v. Commonwealth,* 854 S.W.2d 748, 750 (Ky. 1993) ("This Court will not search the record in order to find error which counsel has failed to present.").

its evidentiary value made in the bench conference during opening statements, we conclude that the trial court properly sustained the objection to the references to the executive agreement in opening statement and excluded the executive agreement from evidence.

Having thoroughly reviewed the parties' arguments before the trial court and the executive agreement at issue, we conclude that the trial court did not abuse its discretion in excluding the executive agreement because the document simply did not have the mitigation value asserted by St. Clair. According to St. Clair's brief, the agreement provided that if St. Clair were not sentenced to death in Kentucky, he would be returned to Oklahoma to be imprisoned in an underground maximum-security facility. However, contrary to St. Clair's arguments, the document did not guarantee that St. Clair would spend the rest of his life in an underground maximum-security prison if he did not receive a death sentence in Kentucky. In fact, although it does recite that at the time of the agreement St. Clair was serving three consecutive life-without-parole sentences in Oklahoma, it does not guarantee that he would actually be required to spend any particular amount of time in an Oklahoma prison. Rather, the agreement simply provided in which state — Kentucky or Oklahoma — St. Clair would be held in custody under certain events.

Having stated its factual[35] and legal bases,[36] the executive agreement clearly sets forth what the Governors of Kentucky and Oklahoma actually agreed to do:

---

[35] The document begins by stating certain relevant facts leading up to the agreement: namely, the serious charges then pending against St. Clair in Kentucky courts and the fact that St. Clair was then "serving three consecutive life without parole sentences" in Oklahoma.

20

**IT IS HEREBY AGREED** by the undersigned Governor of the Commonwealth of Kentucky and the undersigned Governor of the State of Oklahoma that in the event said Fugitive [St. Clair] shall be acquitted following a trial in the courts of the Commonwealth of Kentucky, or the prosecution in the Commonwealth of Kentucky is terminated in any manner other than by the imposition of a judgment and sentence of death, fugitive shall be returned to the State of Oklahoma at the expense of the Commonwealth of Kentucky, and that the Governor, or other acting executive authority of the Commonwealth of Kentucky, shall surrender said Fugitive to the duly authorized agents for the State of Oklahoma.

**IT IS FURTHER AGREED** that, if such return to the State of Oklahoma occurs and said Fugitive is subsequently released from confinement by the Oklahoma Department of Corrections for any reason while continuing to have any term of imprisonment left to fulfill in the Commonwealth of Kentucky, said Fugitive shall be returned to the custody of the Commonwealth of Kentucky.

In essence, the agreement simply states that if St. Clair received any sentence less than death in Kentucky, he would be returned to custody in Oklahoma. If returned to Oklahoma and then released from custody there, he would then be returned into Kentucky's custody if he still had any term of imprisonment left to fulfill in Kentucky.

Even accepting for the sake of argument that lessened escape risk is a valid factor in mitigation under a broad definition of this term,[37] the agreement does not have mitigation value. Other than its reference to St. Clair's serving multiple life-without-parole sentences in Oklahoma, a fact that was abundantly

---

[36] The document acknowledged constitutional and statutory authority for St. Clair's extradition to Kentucky: *citing* U.S. Const. Article IV, Section 2; 18 United States Code Annotated (U.S.C.A.) § 3182; KRS 440.220.

[37] BLACK'S LAW DICTIONARY (8th ed. 2004) offers two definitions of *mitigating circumstance* relevant in the context of criminal law. The second-listed, broader definition is "[a] fact or situation that does not bear on the question of a defendant's guilt but that is considered by the court in imposing punishment and esp. in lessening the severity of a sentence." *But see Jacobs v. Commonwealth*, 870 S.W.2d 412, 419 (Ky. 1994) (indicating that mitigating circumstances should not be overly broadly defined but, generally, refer to defendant's character or record, circumstances of the offense, or statutorily listed mitigating circumstances).

established in other evidence,[38] this Court finds no indication that the executive agreement is relevant to the degree of escape risk because it does not guarantee the length of imprisonment or degree of security of the facility. The document is certainly not relevant to a stricter definition of mitigation relating to a defendant's personal culpability.[39] This Court has declined in the past to adopt a definitive definition of mitigation[40] and has no need to adopt one now. But even under a broad definition of mitigation evidence, this executive agreement does not qualify as mitigation evidence. Because the document was not relevant for the purposes argued by St. Clair to the trial court, the trial court did not abuse its discretion in excluding it[41] nor in sustaining the

---

[38] If the executive agreement was offered only to show that St. Clair was already subject to multiple life without parole sentences, the trial court could properly exclude it as "needless presentation of cumulative evidence" under KRE 403.

[39] *BLACK'S LAW DICTIONARY* (8th ed. 2004) offers first a stricter definition of *mitigating circumstance* relating to the defendant's culpability: "[a] fact or situation that does not justify or excuse a wrongful act or offense but that reduces the degree of culpability and thus may reduce the damages (in a civil case) or the punishment (in a criminal case)." *See also Jacobs*, 870 S.W.2d at 419 ("KRS 532.025 is more expansive in that it spells out eight circumstances of mitigation that are relevant, and it contains a catchall provision, 'any mitigating circumstances otherwise authorized by law.' This provision would permit the trial court to submit redeeming evidence to the jury. However, we believe the evidence must contain facts or a qualified opinion bearing on the defendant's character, prior record or circumstances of the offense, or relative to one of the specified statutory mitigating circumstances.").

[40] *See Tamme*, 973 S.W.2d at 38, *quoting Waters v. Thomas*, 46 F.3d 1506, 1528 (11th Cir. 1995) (jury instructions are not constitutionally required to define "'the concept of mitigation or the function of mitigating circumstances.'")

[41] *See* KRE 402 ("Evidence which is not relevant is not admissible."). Perhaps if the document did guarantee that St. Clair would never be released from prison or would remain in an especially secure area, the document might have some relevance to the determination of a proper sentence. Of course, this possible relevancy would not necessarily mean that the document would be admissible because the trial court might still face other issues, such as whether the document was properly authenticated, duplicative of other evidence, or no longer of binding effect. *See, e.g.*, KRE 403 (exclusion of otherwise relevant evidence on grounds of undue prejudice, confusion, or waste of time); KRE 901 (authentication requirements).

objection to defense counsel's reference to the document in opening statement.[42]

### E. Trial Court Within Its Authority to Deny Allocution.

St. Clair argues that the trial court failed to accord him his right directly to address the jury in mitigation of punishment. Through counsel, St. Clair filed a pretrial motion requesting to "to make allocution to the jury . . . ." Citing *BLACK'S LAW DICTIONARY*, he has defined allocution as an unsworn statement to the sentencing judge or jury.[43] And he quotes *Green v. United States*:[44] "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself."[45] But *Green* concerned a federal defendant's right under a federal criminal procedural rule to make such an unsworn statement to the trial court judge. That case is inapplicable to St. Clair's request to make an unsworn statement to the jury, who, here, would make a sentencing recommendation but would not impose final sentence.

---

[42] *See Mills v. Commonwealth*, 310 Ky. 240, 243, 220 S.W.2d 376, 378 (1949) (opening statements should not refer to clearly inadmissible matters).

[43] *See BLACK'S LAW DICTIONARY* (8th ed. 2004), defining *allocution*, generally, as "[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. • This statement is not subject to cross-examination."

[44] 365 U.S. 301 (1961).

[45] *Id.* at 304. St. Clair also generally cites *Lockett v. Ohio*, 438 U.S. 586 (1978), as authority supporting a right to allocution, although he does not specifically identify where the United States Supreme Court addresses allocution in its decision; and we have been unable to find any specific references to allocution in that case.

He also cites Section 11 of the Kentucky Constitution's right to be heard by himself and counsel[46] and argues that Oregon has interpreted a similar provision in its constitution to establish a right for the defendant to an allucatory address to the jury in a sentencing proceeding.[47] However, we have not interpreted Section 11 of the Kentucky Constitution as establishing an inviolate right to allocute to the jury in a sentencing proceeding, but only as establishing rights to hybrid counsel.[48] Rather, we have recognized that the trial court's broad discretion to conduct orderly proceedings might allow the trial court to allow or disallow allocutory statements to the jury.[49]

Because we have found no right of allocution to the jury under our Kentucky Constitution or other authority and because the trial court had broad discretion in the conduct of its proceedings to allow or disallow such a statement, we find no abuse of discretion in the trial court's denial of St. Clair's allocution request. We also note that St. Clair had neither clearly requested to be hybrid counsel or to represent himself, which would have permitted him to make a closing argument, nor had he chosen to testify at this trial, which would have permitted him to make a sworn statement to the jury, subject, of course, to cross-examination.

F. Victim-Impact Testimony was Properly Admitted.

---

[46] He also cites, *inter alia*, Ky. Const. § 26 pronouncing the Kentucky Bill of Rights inviolate and any law in violation of the Bill of Rights void.

[47] *See State v. Rogers*, 4 P.3d 1261, 1270-72 (Or. 2000) (interpreting Oregon constitutional provision establishing right "to be heard by himself and counsel" to permit allocution to jury but recognizing broad discretion of trial court to establish limits on content and duration of statement).

[48] *Furnish v. Commonwealth*, 267 S.W.3d 656, 663 (Ky. 2007).

[49] *Id.* at 664.

St. Clair contends that the trial court improperly allowed victim-impact testimony in the re-sentencing trial. Admitting that our precedent allows for the presentation of victim-impact testimony during the penalty phase in a capital case,[50] St. Clair argues victim-impact testimony is not specifically allowed by our capital sentencing statute (KRS 532.025), as opposed to our non-capital felony sentencing statute (KRS 532.055), and that the United States Supreme Court case of *Payne v. Tennessee*[51] only permits the admission of such victim-impact evidence in capital cases if allowed by state sentencing statutes.[52]

Contrary to St. Clair's arguments, Kentucky's sentencing statutes allow the presentation of victim-impact evidence during sentencing proceedings in capital cases. Although KRS 532.025, governing sentencing proceedings in capital cases, does not specifically list victim-impact evidence as a potential aggravating factor in capital sentencing, it does provide that the jury may consider any other aggravating factors as "otherwise authorized by law . . . ."[53] Because KRS 532.055(2)(a)(7), which is part of the felony sentencing statute,

---

[50] *See, e.g., Bowling v. Commonwealth,* 942 S.W.2d 293, 303 (Ky. 1997).

[51] 501 U.S. 808 (1991).

[52] *See id.* at 827 ("We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar.").

[53] KRS 532.025(2) states, in pertinent part:

"In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence: . . . [lists of aggravating and mitigating factors]."

25

allows the consideration of victim impact evidence,[54] this consideration is "otherwise authorized by law." So victim impact evidence is allowable in capital sentencing proceedings, despite the specific lack of mention of such evidence in KRS 532.025. This we have recently held in an unpublished case.[55] Accordingly, we reject St. Clair's argument that victim-impact evidence is not admissible in capital sentencing proceedings in Kentucky.

The victim-impact evidence presented at the re-sentencing proceeding in the form of testimony of victim Frank Brady's daughter about his personality characteristics, hobbies, and family connections covered less than ten transcribed pages. Brady's daughter's testimony was neither inappropriate nor excessive. It provided some description of the victim as a "unique human being," rather than a mere statistic, without glorifying or enlarging the victim.

---

[54] KRS 532.055 provides:

> "(2) Upon return of a verdict of guilty or guilty but mentally ill against a defendant, the court shall conduct a sentencing hearing before the jury, if such case was tried before a jury. In the hearing the jury will determine the punishment to be imposed within the range provided elsewhere by law. The jury shall recommend whether the sentences shall be served concurrently or consecutively.
>
> (a) Evidence may be offered by the Commonwealth relevant to sentencing including:
>
> . . . .
>
> (7) The impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims . . . ."

[55] *Stark v. Commonwealth*, No. 2005-SC-000332-MR, 2007 WL 2404453 at *3-4 (Ky. August 23, 2007) (rejecting argument that KRS 532.025(2) did not permit admission of victim-impact evidence during capital sentencing proceedings because such evidence was "otherwise authorized by law").

26

So the victim-impact evidence presented was not unduly prejudicial to St. Clair and would not warrant a reversal of his sentence.[56]

### G. Trial Court Did Not Place Improper Limits on Don Ed Payne Testimony.

St. Clair asserts that the trial court improperly limited his direct examination of witness Don Ed Payne, the lawyer who had represented St. Clair on two murder charges in Oklahoma. Specifically, he complains that he was not allowed to ask Payne in the jury's presence about St. Clair's family's belief that these Oklahoma victims had injured St. Clair's family members and about the history of mental illness in St. Clair's family. The Commonwealth objected to these lines of inquiry on the bases of hearsay and of the defense improperly attempting to impeach the validity of his Oklahoma convictions. The defense argued that it was not attempting to attack the fact of the Oklahoma convictions but to provide background into the circumstances of St. Clair's earlier convictions — namely, that the victims of these crimes were not strangers but people believed by his family to have harmed them. It contended that the evidence it sought to offer was based on the witness's own observations and that it was not offered to prove the truth of the matter asserted, so it was not hearsay; instead, it was "state of mind." The trial court sustained the objection but allowed defense counsel to offer the desired evidence by avowal testimony.

---

[56] See Bowling, 942 S.W.2d at 303, citing, e.g., Campbell v. Commonwealth, 788 S.W.2d 260 (Ky. 1990); Payne, 501 U.S. at 822-27 (holding that victim impact evidence presented was not unduly prejudicial where it provided a "quick glimpse" of the victim as a unique human being without glorifying or enlarging the victim).

Having reviewed Payne's testimony before the jury and his avowal testimony, we find no error in the trial court's handling of this evidentiary matter.

In the presence of the jury, Payne was asked whether, based on his own knowledge, the two Oklahoma victims were known to St. Clair; and he replied that they were. He was also asked whether, of his own knowledge, there had been earlier incidents between St.Clair and the Oklahoma victims; and he replied, "Yes." He was also asked if he became familiar with another case in which St. Clair was convicted of murder; and he replied, "Yes." He was then asked whether, based on his own investigation and history with these cases, St. Clair was accused of violence against a stranger; and he replied, "No." He was also asked whether, based on his own observations, there was any mental illness in St. Clair's family. After replying in the affirmative, defense counsel asked him to explain; and he started to refer to St. Clair's aunt. Following objection by the Commonwealth, defense counsel asked about Payne's observations of this aunt; and he described her as testifying at trial "that little red and green men came to . . ." before being interrupted by the Commonwealth's objection. So St. Clair actually was able to introduce before the jury many of the points he wished to make: the history of mental illness in his family, the fact that these Oklahoma victims were not strangers to him, and the victims' history of "prior incidents" with him.

On avowal, defense counsel asked Payne whether, as a result of his investigation, testimony presented in the courtroom and documents he reviewed, he was "aware of any prior connection or prior history between victim Edward Large and the St. Clair family." Payne stated yes and explained that

28

several members of the St. Clair family believed Large had shot St. Clair's brother, resulting in paralysis. When asked the "same question" about any knowledge of a history between victim Mary Smith and the St. Clair family, Payne replied that members of the St. Clair family believed Mary Smith had stabbed St. Clair's aunt, Buenavista "Chubby" Sides. He further stated that Sides had been hospitalized for schizophrenia and testified during one of St. Clair's Oklahoma murder trials to being visited by little red and green men in jail. When asked whether he had any knowledge of the case against St. Clair for the Oklahoma murder of Junior Kelsey (a case in which Payne did not represent St. Clair), Payne said all he knew about the Kelsey matter was of some incident of "bad feelings" or "bad blood" about an actual or perceived injury involving the St. Clair family.

Payne did not specifically identify which members of the St. Clair family had made statements of belief that the Oklahoma victims had injured their family members. Nor has St. Clair shown that he was prevented from presenting the testimony of family members about this matter. In any event, the state of mind of St. Clair's family members was irrelevant. And while St. Clair's own state of mind at the time of these other crimes might be a valid consideration in the present re-sentencing, other family members' declarations regarding St. Clair's state of mind would not be admissible because the state-of-mind exception to the hearsay rule is only applicable when the declarant

makes a statement about his or her own state of mind.[57] The trial court did

not abuse its discretion by putting limits on Payne's testimony.

## IV. CONCLUSION.

Solely because of the trial court's erroneous instruction on aggravating

circumstance, we reverse the sentence imposed by the judgment and remand

for re-sentencing proceedings in conformity with this opinion.

All sitting. Minton, C.J.; Abramson, Noble, Schroder, and Venters, JJ.,

concur. Scott, J., concurs, in part, and dissents, in part, by separate opinion

in which Cunningham, J., joins. Cunningham, J., concurs, in part, and

dissents, in part, by separate opinion in which Scott, J., joins.

---

[57] KRE 803(3) (recognizing hearsay exception for "[t]hen existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."); *Moseley v. Commonwealth,* 960 S.W.2d 460, 462 (Ky. 1997) ("The statements do not fall within the category of nonhearsay statements tending to prove state of mind. The victim's mental state at the time of her death is not an issue in this case. Nor are the statements probative of Appellant's mental state, since he was not the recipient of the statements.

The Commonwealth posits that the statements fall within the state of mind exception to the hearsay rule. KRE 803(3). However, the statements were offered to prove Appellant's state of mind; and KRE 803(3), by its very language, only applies to prove the state of mind of the *declarant, i.e.,* the victim in this case.") (citation omitted).

SCOTT, J., CONCURRING, IN PART, AND DISSENTING, IN PART:

Although I concur with the majority on the other issues, I must respectfully dissent as to its finding of a "sentencing phase instructional error," as well as its conclusion that a *Faretta/Hill*[1] hearing was required when Appellant's only action as "de facto" co-counsel was to file pro se motions *outside* the presence of the jury.

## I. *FARETTA/HILL* HEARING.

To trigger a *Faretta/Hill* hearing, one must at least ask to represent one's self or to act as one's own co-counsel and then proceed unequivocally. A disdainful filing of pro se motions in violation of the trial court's order, even against advice of counsel — all the while professing that you do *not* want to represent yourself — does not trigger the trial court's advisory obligations, absent an unequivocal expression of one's desire to waive, at least in part, one's right to counsel under the Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution. *See Matthews v. Commonwealth,* 168 S.W.3d 14, 23 (Ky. 2005) ("Under the circumstances presented here, *Faretta* [and] *Hill, supra,* have no application."). It is, however, a cunning way to try and set up reversible error.

Thus, as we noted in *Matthews,*

> [u]nlike the defendants in *Hill, Faretta,* and similar cases, Matthews did not participate as counsel at trial in front of the jury. He did not ask questions of the witnesses nor did he make opening or closing statements. His only participation upon being made co-

---

[1] *Faretta v. California,* 422 U.S. 806 (1975); *Hill v. Commonwealth,* 125 S.W.3d 221 (Ky. 2004).

31

counsel was to file pro se motions [outside the presence of the jury] and, like other defendants, confer with his counsel. Matthews never waived his right to counsel in any manner. [Thus, no] *Faretta* [or *Hill*] hearing was required in this circumstance.

168 S.W.3d at 23. Absent the recognition of such a prerequisite, this case could easily turn into *St. Clair V* (Ky.) or *VI* (Ky.), rather than *St. Clair IV* (Ky.) — which it is.[2]

In December 2004, prior to the sentencing phase retrial ordered by this Court in *St. Clair II* (Ky.), St. Clair began filing a series of approximately seventeen (17) pro se pre-trial motions, the first of which included a handwritten "check-the-box" notation designating himself as "Lead Counsel." Thereafter, at the hearing, as the trial judge started to inquire as to this designation, St. Clair interrupted and unequivocally stated, "I have changed my mind and withdraw that motion."[3] In fact, the order entered following this hearing on January 12, 2005, reflects:

> It was agreed by counsel for the Commonwealth and counsel for the Defendant, along with the Defendant personally, that no further Pro Se motions would be filed by the Defendant or

---

[2] *St. Clair I* (Ky.) was St. Clair's Petition for Extraordinary Relief to prevent his prosecution for capital kidnapping in Hardin County. *St. Clair v. Roark*, 10 S.W.3d 482 (Ky. 2000). *St. Clair II* (Ky.) involved the matter now considered, wherein we reversed and remanded for a new penalty phase hearing. *St. Clair v. Commonwealth*, 140 S.W.3d 510 (Ky. 2004). *St. Clair III* (Ky.) involved St. Clair's death sentence appeal from his conviction in Hardin County for capital kidnapping, among other convictions, which this Court also reversed. *St. Clair v. Commonwealth*, 174 S.W.3d 474 (Ky. 2005). This appeal, then, could properly be characterized as *St. Clair IV* (Ky.). The designation "(Ky.)" appropriately differentiates our cases from St. Clair's four (4) other capital murder convictions in Oklahoma, as well as the murder in New Mexico. *See St. Clair II*, 140 S.W.3d at 561-71.

[3] In fact, the trial judge had just stated, "Mr. St. Clair wants to be designated as lead counsel. So I will take . . .," when he was interrupted by St. Clair, who said, "I have changed my mind and withdraw that motion."

32

considered by the Court and, that if any Pro Se motions are filed, they should be directed to counsel for the Defendant.

St. Clair, however, continued to file pro se motions with the court. Thereafter, in response to his continuing pro se filings and, in particular, a subsequent motion to fire his attorney, the Commonwealth, at the August 10, 2005 pre-trial hearing, stated that

> [i]n his Pro Se Motion St. Clair does not make clear whether he's wanting new counsel, whether he wants to proceed pro se, whether he wants hybrid counsel . . . [I] don't know whether he's going to withdraw [this motion] today. But if he's going to press this motion then we need to find out what exactly it is he wants other than a complaint in general about his lawyers.

In response, St. Clair *again* stated that he did *not* want to represent himself but that he wanted new attorneys.[4] Following the hearing, his motion to discharge counsel was denied.

Moreover, St. Clair makes no allegation that he acted as his own counsel or co-counsel in front of the jury during the penalty phase retrial — claiming only, that "[s]ince both the trial court and the defense attorneys acquiesced in St. Clair's hybrid representation, it was incumbent upon the court to hold a hearing." This, however, avoids any assertion that St. Clair acted as such during the trial in front of the jury. It also avoids the essential precursor for a *Faretta/Hill* hearing — the unequivocal request, coupled with the necessary intent to make the required waiver.

In *Winstead v. Commonwealth*, we noted:

---

[4] This was six (6) days before trial in August of 2005, for a murder occurring in 1991.

Because the assistance of counsel is generally regarded as a crucial component of a fair trial, the right to that assistance has been characterized as a fundamental constitutional right. For the same reason, courts indulge 'every reasonable presumption against a waiver of counsel.' To overcome that presumption and conduct his own defense, a defendant must clearly and unequivocally seek to represent himself. It is not enough to express dissatisfaction with counsel or to request different counsel; the defendant, rather, must unequivocally ask to proceed *pro se.* If a defendant unequivocally invokes his right to defend himself, the trial court is then obliged to conduct a hearing to ensure that the defendant's waiver of the right to counsel is both knowing and voluntary. The court's obligation does not arise, however, unless and until the defendant clearly invokes his *pro se* right. Because that right does not implicate constitutional fair-trial considerations, moreover, the trial court has no *sua sponte* duty to inform the defendant of his right to proceed *pro se.*

We are not persuaded that Winstead's *pro se* motions in his letter to the trial court overcame his presumed reliance on counsel.

283 S.W.3d 678, 683 (Ky. 2009) (internal citations omitted).

Both *Faretta* and *Hill* hinge on the proposition that in order to proceed pro se, or with hybrid counsel, one must be *willing* and able to waive the full benefit of representative counsel under the Sixth Amendment of the United States Constitution and Section Eleven of the Kentucky Constitution. *Faretta,* 422 U.S. at 835 ("Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel."); *Hill,* 125 S.W.3d at 224 ("[O]nce counsel was appointed, Appellant requested only to serve as co-counsel . . . so that he could perform the direct and cross-examination of some of the witnesses."). Here, in both instances when the subject matter was addressed, St. Clair reiterated that he did *not* want to represent himself.

34

Thus, like *Matthews*, there is no assertion that St. Clair participated as counsel or co-counsel at trial in front of a jury, nor did he ever unequivocally offer to waive his right to counsel. 168 S.W.2d at 23 ("His only participation . . . was to file pro se motions and, like other defendants, confer with counsel."). Thus, there is nothing in this record that gives rise to a violation of *Faretta/Hill*.

## II. THE SENTENCING PHASE INSTRUCTION.

Moreover, as to the "sentencing-phase instructional error," the majority is reversing the trial court for doing what the Court directed it to do by virtue of our pronouncements in *St. Clair II* (Ky.).

St. Clair had four murder convictions in Oklahoma. Two of these convictions were entered prior to the Bullitt County murder of Frank Brady on October 6, 1991. The two other murders occurred prior to Brady's death, yet these convictions were not obtained until 1994 due to St. Clair's escape. All four of the convictions, however, were admissible as pertinent to the jury's sentencing functions. KRS 532.025(1)(b);[5] *see also St. Clair II*, 140 S.W.3d at

---

[5] KRS 532.025(1)(b) reads:

> In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted in the same manner as presentence hearings conducted before the judge as provided in paragraph (a) of this subsection, including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant. Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.

35

571 (["W]e observe that all of them were admissible at the capital sentencing phase pursuant to KRS 532.025(1)(a).");  *Fields v. Commonwealth,* 274 S.W.3d 375, 418 (Ky. 2008).

As to the aggravating circumstance, KRS 532.025(2)(a)(1) defines it as where "the offense of murder . . . was committed by a person with a prior record of conviction for a capital offense . . . ." Thus, during the original trial, the trial court crafted an "aggravating circumstance" instruction that read, "the Defendant has a prior record of conviction for murder, a capital offense." Thereafter, on appeal, we concluded that "for purposes of KRS 532.025(2)(a)(1), [a] 'prior record of conviction for a capital offense' includes a plea of guilty accepted by trial court or a jury's or a judge's verdict of guilty." *St. Clair II,* 140 S.W.3d at 570. We then concluded "that the trial court's articulation of [the] aggravating circumstance changed its meaning. [Thus, upon] remand, the trial court should instruct the jury in accordance with the statutory language, i.e., 'the murder was committed by a person with a prior record of conviction of a capital offense.'" *Id.* at 571. *St. Clair II* (Ky.) was rendered in 2004.

The next year, in 2005, in *St. Clair III* (Ky.), we *again* considered this "aggravating circumstances instruction," this time arising out of St. Clair's Hardin County kidnapping of Francis Brady. The second aggravating circumstances instruction there read, "[t]he Defendant has a prior record of conviction for murder, a capital offense." 174 S.W.3d at 481. This is the *same* language for the *same* instruction criticized in *St. Clair II* (Ky.). *See* 140 S.W.3d at 562, 571. Yet, in *St. Clair III* (Ky.), we concluded that "this instruction was

36

correct. The trial court properly concluded that St. Clair had a prior record of conviction for murder." 174 S.W.3d at 483. We also noted, "[a]s a matter of law, St. Clair had two prior capital convictions for the 1991 murders before he committed the kidnapping." *Id.* at 484.

Upon retrial in this case, in August of 2005, the trial court – attempting to comply with this Court's directions – reformulated this aggravating circumstance instruction to read, "[t]he murder was committed by the Defendant and the Defendant has a prior record of conviction of murder, capital offense." However, the majority now holds that "the trial court's instructions not only failed to follow this Court's explicit directive following the first appeal, but the instruction, as given, deprived St. Clair of his right to a unanimous verdict. And, 'the denial of a unanimous verdict – where the error is properly preserved – is not subject to a harmless error analysis.'" Slip op. at 6. The majority goes on to state:

> The better course would be to identify specifically the one or more convictions that *could* qualify as a 'prior record of conviction for a capital offense' to avoid any possibility that the jury's verdict is not unanimous. For example, a proper instruction could read:
>
>> In fixing a sentence for the Defendant for the offense of Murder, you shall consider the following aggravating circumstance which you may believe from the evidence beyond a reasonable doubt to be true:
>>
>> (1)    the offense of murder was committed by a person with a prior record of conviction for a capital offense:
>>
>> the September 1991 Murray County, Oklahoma, conviction for the first-degree murder of William Henry Kelsey, Jr.

37

Slip Op. at 7. The majority also notes that Ronnie St. Clair's murder would also qualify, and notes further that "[b]y specifically identifying qualifying convictions that can be used as aggravators, the trial court ensures that the jury cannot rely on convictions that cannot qualify." *Id.*

While I agree with the simplicity (and accuracy) of the majority's *new* configuration of the instruction, I disagree with its underlying conclusions for two reasons. First, in *St. Clair II (Ky.)*, we directed the trial court to formulate the instruction *in the manner it did.* And, secondly, any resulting error is simply harmless. Indeed, how could the error be harmful when we recognized in *St. Clair III* (Ky.) that *"[a]s a matter of law*, St. Clair had two prior capital convictions for the 1991 murders before he committed the kidnapping"? 174 S.W. 3d at 484 (emphasis added).

In *St. Clair II* (Ky.) and *III* (Ky.), we considered the same instructions. In *St. Clair II* (Ky.), we directed that "[u]pon remand, the trial court should instruct the jury in accordance with the statutory language, *i.e.*, 'the murder was committed by a person with a prior record of *conviction of a capital offense.*'" 140 S.W.3d at 571 (emphasis added). And, in *St. Clair III* (Ky.), we noted the prior "instruction . . . was correct. The trial court properly concluded that St. Clair had a prior record of conviction for murder."[6] 174 S.W.3d at 483. Clearly, what we said and how we said it was, at best, murky. Thus, in support of the trial court's attempt to understand the directions given by the

---

[6] In fact, the majority here posits that the issue *was properly preserved* by St. Clair's tendered instruction, which read: "[t]he offense of murder was committed by a person with a prior record of conviction for a capital offense." Slip Op. at 5.

38

court in *St. Clair II* (Ky.), it reformulated the aggravating circumstance instruction to read, "[t]he murder was committed by the defendant and the defendant has a prior record of conviction of murder, capital offense." In so doing, in my opinion, the trial court did what it was directed to do by this Court. I simply cannot read the trial court's response in any other way. If we had said there what the majority posits today, I could agree — but we did not.

In addition, in the guilt phase of the first trial, St. Clair testified that he had been convicted by a jury of two counts of murder in Oklahoma prior to the murder of Francis Brady. This testimony, along with the other guilt-phase testimony, was introduced verbatim in the re-trial. Moreover, the prosecution introduced records of the convictions. These convictions were not seriously contested.

Thus, in my opinion, it is illogical to argue that the jury may have found that St. Clair only had one conviction and that it was an impermissible one, when the logical conclusion would be — that if they were going to err — they would have found all four convictions of which they were permissibly aware. *St. Clair II*, 140 S.W. 3d at 571 ("[W]e observe that all of them were admissible at the capital sentencing phase pursuant to KRS 532.025(1)(a)."). And, therefore, given that the jury undoubtedly found (at least) both permissible convictions (of the four) — ones we took judicial notice of as a matter of law, *St. Clair III*, 174 S.W.3d at 484 — it can be said "with fair assurance that the judgment was not substantially swayed by the error." *Winstead*, 283 S.W.3d at 679 (citing *Kotteakos v. U.S.*, 328 U.S. 750 (1946)). To suggest that lumping

39

the two impermissible convictions together with the two permissible ones might have swayed the jury wrongfully assumes a "doubling impact" of the convictions on the jury. This is a point I cannot accept for the reason that an item of evidence attains its maximum impact upon a jury at the moment of introduction (within the context of the other evidence), not upon its subsequent review in the jury room.

For the foregoing reasons, I must respectfully dissent and would affirm the judgment and sentence of the Bullitt Circuit Court. Cunningham, J., joins.

CUNNINGHAM, J., CONCURRING, IN PART, AND DISSENTING, IN PART: I join Justice Scott's opinion concurring, in part, and dissenting, in part; however, I wish to write further concerning the sentencing phase instructions.

In September of 1991, Appellant had already been convicted of murdering two people when he escaped from an Oklahoma jail with another inmate. Appellant and his partner then kidnapped Timothy Keeling, stole his truck, and executed the man in cold blood in a New Mexico desert. They made their way to Kentucky, where they kidnapped Frances Brady, took his vehicle, and set it afire. They then executed Brady in a secluded area of Bullitt County. When stopped for a routine traffic check in Hardin County by Trooper Herbert Bennett, Appellant fired shots into Bennett's police cruiser. Both fugitives tried to flee, but Appellant was apprehended. Appellant was subsequently convicted of the murder of Frances Brady and sentenced to death. This case has been before us several times.

KRS 532.025(2)(a)(1) states as an aggravating circumstance that "[t]he offense of murder or kidnapping was committed by a person with a prior record of conviction for capital offense . . . ." The majority correctly points out that the instruction given in this case was in error, in that it reads that the person only has to have a prior record of conviction for capital offense at the time of trial, as opposed to the time of the offense. However, it was obviously a harmless miscue, since the record is clear that Appellant did have, in fact, a conviction for a capital offense at the time he committed the offense in question. To be honest, Appellant has killed so many people and been convicted so many times for murder, it is difficult to sift through the record before me and ascertain exactly when all the murders were committed and the dates of all the convictions. He was also convicted in Oklahoma in 1994 — after the Brady killing — for the murders of Mary Louise Smith and Edward Jefferson Large.

The remaining portion of KRS 532.025(2)(a)(1) reads: "or the offense of murder was committed by a person who has a **substantial history of serious assaultive criminal convictions**." (Emphasis added.) Obviously, and as Justice Scott points out, all of the prior murders committed by Appellant before the trial were admissible. At least two of the capital offenses committed prior to the murder of Brady had evolved into convictions at the time of the Brady trial.

The erroneous wording of the instructions would loom large if Appellant had no capital convictions prior to the murder of Brady. But that is not the case. Appellant is a serial murderer, guilty of the cold-blooded killing of —

41

according to my count — at least six innocent people. He is not entitled to a perfect trial. No American is. He is only entitled to a fair one, and he has had several. This is his fourth or fifth trip to this state's highest court. It makes one tired to consider the amount of litigation he has likely engendered within the borders of the other states he has terrorized. He has received his ample allotment of due process. I would affirm the conviction. Scott, J., joins.

COUNSEL FOR APPELLANT:

Donna Lynn Boyce
Appellate Branch Manager
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, Kentucky 40601

Emily Holt Rhorer
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, Kentucky 40601

Linda Roberts Horsman
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, Kentucky 40601

Shannon Renee Dupree
Assistant Public Advocate
Department of Public Advocacy
Suite 302, 100 Fair Oaks Lane
Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

David A. Smith
Assistant Attorney General
Office of Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204

Franklin Todd Lewis
Executive Director
Office of the Attorney General
Office of Special Prosecutions
1024 Capital Center Drive
Frankfort, Kentucky 40601

William Robert Long, Jr.
Assistant Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204

# Supreme Court of Kentucky

## 2005-SC-000828-MR

MICHAEL DALE ST. CLAIR          APPELLANT

     ON APPEAL FROM BULLITT CIRCUIT COURT
V.        HONORABLE THOMAS WALLER, JUDGE
         NO. 92-CR-00010-002

COMMONWEALTH OF KENTUCKY        APPELLEE

## ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION

The Appellee having filed a Petition for Rehearing of the Opinion of the Court by Chief Justice Minton, rendered April 22, 2010; and the Court being otherwise fully and sufficiently advised;

The Court ORDERS that the Petition for Rehearing is DENIED. The Court, *sua sponte* modifies the Opinion of the Court by Chief Justice Minton, rendered April 22, 2010, to correct footnote numbering errors. The attached opinion is SUBSTITUTED in lieu of the original. Said modification does not affect the holding.

All sitting. Minton, C.J., Abramson, Noble, Schroder, Scott and Venters, JJ., concur. Cunningham, J., would grant.

ENTERED: September 23, 2010.

CHIEF JUSTICE